IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



FILED

APR 1 2 2016

Clerk, U.S. District Court
District Of Montana
Billings

ROBERT ALWOOD,

               Plaintiff,

vs.

ECOLAB, INC.,

               Defendants.

CV 14-101-BLG-SPW

OPINION AND ORDER

Plaintiff Robert Alwood filed this action against his former employer, Defendant Ecolab, Inc., for disability discrimination, age discrimination, retaliation, and wrongful discharge. (Doc. 1-1). Alwood seeks compensatory and punitive damages. (*Id.* at 15-16). Now pending is Ecolab's motion for summary judgment on all of Alwood's claims. (Doc. 22). Alwood concedes summary judgment on his age discrimination claim. (Doc. 29 at 33). As discussed below, genuine issues of material fact exist respecting the remaining claims. Accordingly, the Court grants Ecolab's motion in part and denies it in part.

## I.    Statement of Facts

Ecolab is an international company operated out of Minnesota. (Doc. 30 at ¶ 7). Ecolab hired Alwood in 1990. (*Id.* at ¶ 17). He was promoted to district manager for Ecolab's Billings District in 1998. (*Id.* at ¶ 20). The Billings District

is part of the larger Rocky Mountain District, which covers Colorado, Idaho, Montana, Utah, and Wyoming. (Doc. 25, ¶ 4). As the Billings district manager, Alwood was responsible for leading and managing territory managers over virtually the whole state of Montana so that Ecolab could achieve sales and customer satisfaction goals. (Doc. 30. at ¶ 28; Doc. 32, ¶ 14).

After 23 years with the company, Alwood began suffering work-related anxiety and depression in the spring of 2013. (Doc. 32 at ¶ 3). He treated with Karen Keitzman, a psychologist to address his issues but continued working. (*Id.* at ¶ 4). In March and April 2013, Alwood received written warnings from management addressing work-related issues. (Doc. 30 at ¶ 30). In May 2013, Alwood visited Keitzman because he was depressed and anxious. (*Id.* at ¶ 53). Keitzman concluded that Alwood was again suffering from severe depression and anxiety. She began treating him with regular therapy sessions. (*Id.* at ¶ 54).

On August 13, 2013, Alwood received a final written warning about his performance at work. (*Id.* at ¶ 58). The next day, Alwood submitted a letter from Keitzman to Ecolab's Disability Case Manager Shelly Burgess, stating he needed to take a leave of absence from work. (*Id.*) Neither Keitzman's letter nor her accompanying Physician's Statement of Disability provided how long Alwood would be absent. (*Id.* at ¶ 60). Burgess immediately placed Alwood on Ecolab's Short-Term Disability Plan, which allows employees up to 180 days of leave. (*Id.*

2

at ¶ 63). Because Alwood was excused from work beginning on August 13, 2013, he was eligible to remain on leave until February 10, 2014. (*Id.* at 64).

Burgess notified Ecolab's Human Resources Representative Katie Bjorkman that Alwood was out on leave, effective August 15, 2013. (*Bjorkman Depo.* 63:6-7, Doc. 31-13). Bjorkman added Alwood to her tracking spreadsheet for all disability leaves and then notified Scott Salstrand, Alwood's Area Manager, via email that Alwood was out on leave. (*Id.* at 63:19-20; Doc. 31-14). In the same email, Bjorkman advised Salstrand that it is a "best practice" to check in with Alwood throughout his leave and ask about an expected return to work date. (*Id.*) Bjorkman also forwarded Salstrand Ecolab's "Short Term Disability Manager Toolkit" which instructed that the manager should provide Bjorkman with updates on the employee. (Doc. 31-4; 31-19; *Bjorkman Depo.* 76:22-25, Doc. 31-13). Salstrand sent Alwood an email on August 15, 2013, wishing him a speedy recovery. (Doc. 31-21). Salstrand never spoke with Alwood again. (*Salstrand Depo.* 181:12-14, 184:10-21, Doc. 31-2)).

At some point after Alwood went out on leave, Salstrand notified Alwood's team that Alwood was on a leave of absence. (*Id.* at 123:13) Salstrand routed Alwood's customer calls to himself and another district manager, Brian Last. (*Id.* at 125:17-21). Last understood that while Alwood was out, he was the primary point of contact for territory managers in the Montana District. (*Last Depo.* 15:21-

3

16:1, Doc. 31-1). He received several calls a week, but did not feel he was unable to cover for Alwood. (*Id.* at 30:17-20). He did not recall any personnel issues or loss of sales while Alwood was out. (*Id.* at 15:105; 24:14-22). Prior to Alwood's leave of absence, Terry Eckhard, a territory manager, expressed dissatisfaction with Alwood's lack of support to Salstrand. (Doc. 28 at ¶ 6). Last also experienced difficulties with Terry Eckhard, but Eckhard never complained to Last that he lacked training or was not supported by Alwood. (*Id.* at 18:11-19:6).

While Alwood was out on disability leave, Town Pump, one of Ecolab's largest customers in the Billings District, began using a competitor for its Bozeman hotel. (Doc. 28 at ¶ 14). Salstrand became concerned that Town Pump would discontinue using Ecolab for all of its hotels, which would have been catastrophic for the Billings District. (*Id.*) While Alwood was out, Ecolab's relationship with another client, Sysco Foods, began to suffer. (*Id.* at ¶ 15). Salstrand received complaints from Sysco that Ecolab's territory managers were not engaging in relationship building with Sysco. (*Id.* at ¶ 15). Another district manager, not Alwood, was the liaison between Sysco and Ecolab. (*Salstrand Depo.* 93:11-15, Doc. 31-2). Salstrand does not remember if he traveled to Montana once during Alwood's disability leave. (*Id.* at 122:23-123:10).

On September 6, 2013, three weeks after Alwood went on leave, Salstrand contacted Human Resources Manager Maria Pariseau and asked if there were any

4

"options" with respect to Alwood's position. (*Id.* at 138:24-139:1; Doc. 32-20).

Three days later Pariseau informed Salstrand that Alwood would be out another month and from a legal standpoint, Alwood's job was "protected," so they would need to wait the month out and request additional documentation from Alwood's doctor. (Doc. 31-20). Salstrand pressed Pariseau on why Alwood was out. (*Id.*) On September 15, 2013, Pariseau informed Salstrand that HIPAA laws prevented her from disclosing why, but that she was not confident they could present an argument to the legal department that Alwood would not return. (*Id.*) On the same day, Alwood submitted a note to Burgess from his medical provider that he was on an 8-week treatment plan. (Doc. 30 at ¶ 76(a)). Burgess and Salstrand were responsible for communicating with Bjorkman in Human Resources regarding Alwood's return to work date. (*Bjorkman Depo.* 79:7-13, Doc. 31-13). Salstrand did not contact Bjorkman for any updates on Alwood's status. (*Id.* at 77:5-7).

Salstrand emailed Pariseau again on September 26, 2013, and told her that "things were beginning to boil over in Montana," and that if they waited much longer, "the business and personnel losses will be quite substantial." (Doc. 31-20) On November 1, 2013, Burgess contacted Alwood for the first time to inquire about his return date. (Doc. 31-10 at 6) Alwood informed her that he did not have an exact return date but had an appointment with his doctor on November 11, 2013, was making progress, and expected to be able to return in December.

5

(*Burgess Depo.* 62:20-63:9, Doc. 31-9). Salstrand replaced Alwood as District Manager the same day. (*Salstrand Depo.* 174:2-7; Doc. 31-2). Alwood believed that according to Ecolab's policies, he could not be replaced until six months had elapsed. (*Alwood Dec.* ¶ 13, Doc. 32). Last shared this belief. (*Last Depo.* 33:17-34:6, Doc. 31-1).

On November 12, 2013, Alwood submitted a note from his medical provider that he may be able to return to work on December 16, 2013, depending on his response to further treatment. (*Burgess Depo.* 62:20-63:9, Doc. 31-9). On December 16, 2013, Alwood was cleared to return to work. (Doc. 31-18). Burgess emailed Bjorkman and advised her that Alwood had been fully released to return to work. (*Id.*) Alwood contacted Bjorkman the next day about returning to work, but did not receive a call back. (*Bjorkman Depo.* 135:3-14, Doc. 31-13). He called again on December 19, 20, and 27th, about returning to work, but again received no return calls. (*Id.* 135:1-24). Although the dates vary, it appears Bjorkman may have advised Alwood that he had been replaced as district manager in November, but more likely sometime in late December or early January. (*Comp. id.* at 87:15-21; Doc. 25 at ¶).

On January 2, 2014, Alwood sent an email to Bjorkman expressing frustration that no one had returned his calls so he did not know his position or to whom he should report since he had been removed as district manager. (Doc. 31-

6

23). On the same day, Bjorkman advised Alwood via letter that Ecolab did not have a current opening in the Billings District and directed him to Ecolab's website for open positions within the company. (Doc. 25-5) She also advised him that if he identified any positions that required him to relocate, he would need to do so at his own expense. (*Id.*) On January 6, 2014, Alwood applied for the Safety, Health and Environmental Specialist position and received an automatic reply that his application was being reviewed. (Doc. 25-6).

The next day, Alwood emailed Bjorkman for a list of openings for district manager positions, area manager positions, and Corporate Accounts positions, because jobs in these categories were not posted online. (Doc. 25-7). Alwood informed Bjorkman he was willing to look at all locations available. (*Id.*) On January 13, 2014, Bjorkman emailed Alwood a list of open district manager positions located in Virginia, California, Nevada, Minnesota, Wisconsin, Texas and New Jersey. (Doc. 25-8) Although Salstrand was Alwood's direct manager and the person who was most familiar with open positions in the Rocky Mountain Region, Bjorkman did not consult with Salstrand about any potential open positions. (*Salstrand Depo.* 221:16-21; Doc. 31-2)

Alwood's application for Safety Specialist was ultimately rejected because he did not meet the minimum qualifications required for the position. (*Bjorkman Depo.* 129:4-6, Doc.31-13). Ecolab unilaterally decided to extend the 30 days to

56 days. On February 10, 2014, Alwood was terminated from Ecolab as of February 6, 2014, for failing to locate an open position in which he was interested and qualified within 56 days. (Doc. 31-24).

## II. Legal Standard

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party and a dispute is "material" only if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 130, 150 (2000); *Anderson,* 477 U.S. at 249-50. The Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in the non-moving party's favor. *Anderson,* 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.,* 504 F.3d 1017, 1020–21 (9th Cir. 2007).

## III. Discussion

### A. Alwood's Disability Discrimination Claim

Ecolab argues that Alwood's disability claim is subject to summary judgment because Alwood did not present sufficient evidence for a *prima facie* claim. That is, he failed to establish that he was a "qualified individual with a disability," or that keeping his position open "indefinitely" was a reasonable accommodation. The Court addresses these arguments in turn.

#### 1. Montana Human Rights Act

Under the Human Rights Act, it is unlawful for an employer to discriminate against an employee on the basis of a physical or mental disability, unless the reasonable demands of the position require a distinction based on physical or mental disability. Mont. Code. Ann. § 49-2-303(1)(a). Physical or mental disability includes "a physical or mental impairment that substantially limits one or more of a person's major life activities; (ii) a record of such impairment; or (iii) a condition regarded as such an impairment." M.C.A § 49-2-101(19)(a). A mental impairment can be a mental or psychological disorder, including emotional or mental illness such as major depression. *Pannoni v. Board of Trustees,* 90 P.3d 438, 444 (Mont. 2004). Work is considered a major life activity. *Id.*

Discrimination based on physical or mental disability includes "the failure to make reasonable accommodations that are required by an otherwise qualified

9

person who has a physical or mental disability." MCA § 49-2-101(19)(b). A person with a physical or mental disability is qualified to hold an employment position "if the person can perform the essential functions of the job with or without a reasonable accommodation for the person's physical or mental disability." *Pannoni,* 90 P.3d 438 at 444 (citing Admin. R.M. 24.9.606(2)); *see also* 29 C.F.R. app. § 1630.9 ("An individual with a disability is 'otherwise qualified' . . . if he or she is qualified for a job, except that, because of the disability, he or she needs a reasonable accommodation to be able to perform the job's essential functions.")

The determination as to whether an individual is a "qualified individual with a disability" must be made at the time of the employment decision. *Id.* at 444-45. If, even with a reasonable accommodation, a person is unable to perform the essential job functions, he is not a qualified person. *Id.* It is the employee's burden to prove that he can perform the essential job functions for a position in order to establish he is a qualified person. *Id.* If a reasonable accommodation available to an employer could plausibly enable a disabled employee to adequately perform his job, an employer is liable for failing to attempt that accommodation. *Id.* at 319 (citing *Kimbro v. Atlantic Richfield Co.,* 889 F.2d 869, 879 (9th Cir. 1989)).

### a. Qualified Individual

Ecolab argues that because Alwood could not perform the essential functions of his job on the day Ecolab replaced him as district manager, Alwood was not a "qualified individual with a disability" and, as a result he cannot establish a *prima facie* disability claim. Ecolab is wrong.

Under Ecolab's theory, only a person who could work despite their disability on the day of the employment decision could make a *prima facie* case for disability discrimination. This interpretation of the law is illogical and would preclude virtually all disability discrimination claims. For example, if a painter broke his arm on Monday, and his employer filled his position on Friday, Ecolab suggests that the painter is a "qualified individual with a disability" only if, with his broken arm, he could have painted on Friday.

But the full question under the law is whether at the time of the employment decision, the employee can perform the essential functions of his job *assuming the employer provides him a reasonable accommodation*. (Emphasis added). *See also Kimbro*, 889 F.2d at 878 ("As long as at the time of [the employee's] termination, there were "plausible reasons to believe that the handicap [could have been] accommodated" by the leave of absence, [the employer] is responsible for its failure to offer such a leave.") Thus, with respect to the painter - the appropriate question is - as of Friday, was the painter qualified to paint, assuming his employer

11

provided him with a reasonable accommodation (such as time off work to heal his broken arm). By failing to include the accommodation element and instead only focusing on Alwood's disability during the time of his short term disability leave, Ecolab misapplies the "qualified individual" requirement.

A qualified individual with a disability is someone who is qualified for a job, except that, because of the disability, he needs a reasonable accommodation to be able to perform the job's essential functions." *Pannoni,* 90 P.3d at 445. Here, Alwood was qualified for his job on the day Ecolab replaced him, but he needed a reasonable accommodation - here, a leave of absence - to perform the job's essential functions. *See Nunes v. Wal-Mart Stores, Inc.,* 164 F.3d 1243, 1247 ("Unpaid medical leave may be a reasonable accommodation under the ADA . . . . Even an extended medical leave, or an extension of an existing leave period, may be a reasonable accommodation if it does not pose an undue hardship on the employer") (internal citations omitted).

The Court will assume for purposes of this query that the leave Alwood requested was a reasonable accommodation. There is no dispute that Alwood was otherwise qualified to perform his job requirements. After the accommodation period, Alwood was qualified to perform the essential functions of his position and his medical provider indicated that he was capable of performing his job at that

12

point. Alwood has established that he was a "qualified individual with a disability" as of November 7, 2013.

### b. Reasonable Accommodation

Ecolab contends that, even assuming Alwood was a qualified individual, it did not violate the Human Rights Act because the accommodation Alwood requested was not reasonable. Under Montana law, "[a]n accommodation to a person with a physical or mental disability for the purpose of enabling the person to perform the essential functions of an employment position is reasonable unless it would impose an undue hardship upon the employer" or "would endanger the health or safety of any person." Admin. R.M. 24.9.606(4), (6). The burden of proof is on the employer. *Id.* In the summary judgment context a court should weigh the risks and alternatives, including possible hardships on the employer, to determine whether a genuine issue of material fact exists as to the reasonableness of the accommodation. *Nunes*, 164 F.3d at 1247.

Ecolab argues that keeping the Billings district manager position open indefinitely while Alwood remained on leave was not reasonable. Alwood sufficiently raised genuine issues of material fact regarding this contention, however. First, Alwood argues that his medical provider informed Ecolab that he was on an eight week treatment program. (Doc. 30 at ¶ 76(a)). Ecolab disputes this fact. Alwood testified he told Ecolab's HR that he was coming back in

13

December. Ecolab disputes this fact as well. These material facts are central to the question of whether Ecolab had reason to believe Alwood's leave was indefinite.

Additionally, the evidence in the record is that no one at Ecolab ever asked Alwood how long he intended to remain out on leave. This is true despite the fact that Ecolab's Short-term Disability Supervisor/Manager Toolkit (Doc. 31-19) and Bjorkman's email to Salstrand on August 15, 2013, (Doc. 31-5), advise the supervisor to communicate with the employee and ask the employee for an expected time to come back to work. This evidence provides a prima facie case of discrimination and raises a genuine issue of material fact as to whether Ecolab had reason to believe Alwood's disability leave was indefinite.

Ecolab also argues that Alwood's leave was unreasonable because it required his co-workers to work harder. Specifically, Ecolab argues that Salstrand, Brian Last, and various territory managers had to do Alwood's job on top of fulfilling their own duties. (Doc. 23 at 28). Alwood points out, however, that Brian Last was the individual covering for Alwood while he was out and Last testified he had no problems covering the Montana District. (*Last Depo.* 15:1-5; Doc. 31-1) Salstrand could not remember whether he had been required to travel to Montana to assist. And no one was tasked with Alwood's leadership duties. The evidence is disputed whether anyone at Ecolab had to work harder because of Alwood's absence.

Alwood went out on short term disability leave with Ecolab's approval, whose short term disability policy included paid leave of up to six months. Throughout the leave period, Alwood submitted medical documentation to Ecolab that may have first indicated he was on an eight week treatment plan and eventually reported that he would be able to return in December 2013. In *Kimbro*, the Ninth Circuit recognized that an employee who suffered from acute migraine episodes was justified in requesting a temporary leave of absence as an accommodation for his disability where the leave would have allowed his doctor to formulate an effective treatment. *Kimbro,* 889 F.2d at 879.

Like in *Kimbro*, Alwood has offered evidence tending to show that his leave would be temporary. In fact, when Alwood was replaced as district manager, he had not yet exhausted his short term disability leave. Alwood did not ask for more leave than would be granted to any other short-term disability employee at Ecolab. Both Alwood and Brian Last testified it was their understanding that an employee could not be replaced until the short term disability leave was exhausted. Finally, no one at Ecolab had even inquired when he was coming back. This evidence taken together raises a genuine issue of material fact as to whether Alwood's leave of absence, projected to extend to December 2013, was a reasonable accommodation. Summary judgment is not appropriate.

## B.  Alwood's Retaliation Claim

To establish a prima facie case of retaliation under Montana law, an employee must be able to show that (1) he engaged in a protected activity, that (2) he was thereafter subjected to adverse employment action by his employer, and that (3) there was a causal link between the two.  *Rolison v. Bozeman Deaconess Health Services, Inc.*, 111 P.3d 202 (Mont. 2005).  To establish causation between a protected act and an adverse employment action, the employee must demonstrate that engaging in the protected activity was one of the reasons for the adverse employment action.  *Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1064-65 (9th Cir. 2002).  The Ninth Circuit has recognized that in some cases, causation can be inferred from timing alone; however, the adverse employment action must have occurred fairly soon after the employee's protected expression.  *Id.*

If the plaintiff establishes a prima facie case, the burden shifts to the employer to offer a legitimate non-retaliatory reason for the adverse employment action.  *Id.* at 207; *see also Davis v. Team Elec. Co.*, 520 F.3d 1080, 1088-89, 1091 (9th Cir. 2008).  If the employer offers such a reason, the burden then shifts back to the plaintiff to show that there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual.  *Id.* at 206-07.

Alwood asserts Ecolab retaliated against him for taking time off due to his disability. (*See* Doc. 1-1 at 9). Ecolab argues that Alwood has failed to allege a prima facie case of retaliation. It also argues that Alwood cannot establish a causal link between Alwood's filing of the disability claim and his termination.

### 1.   Prima Facie Case

The Court finds that Alwood sets forth a prima facie case of retaliation for requesting an accommodation. First, Alwood has provided sufficient evidence that he was engaged in a protected activity - specifically that he requested an accommodation for his disability. *See Coons v. Sec'y of U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2004) ("the ADA prohibits an employer from retaliating against an employee who seeks an accommodation in good faith.") Alwood had a history of depression and a doctor's note requesting leave. There's no evidence he sought the accommodation in bad faith.

Second, Ecolab subjected Alwood to an adverse employment decision after his request for leave. He was removed from his district manager position on or about November 1, 2013. *See* Admin. R. Mont. 24.9.603(2)(b) (Adverse employment actions include discharge and demotion). Third, there appears to be a causal link between the protected activity and Ecolab's action, because Alwood took short term disability leave at the end of August 2013, his supervisor started

17

discussing his replacement in September 2013 and had replaced him by November 2013. The Court finds that causation may be inferred from this timing alone.

Because Alwood successfully sets forth a prima facie case of retaliation for taking disability leave, Ecolab must articulate a "legitimate, non-discriminatory" reason for its employment decisions. *See Rolison*, 111 P.3d 202, 207. Ecolab has offered two reasons to justify its replacement of Alwood as district manager.[1] At the time it replaced him, Ecolab argues that it believed the District was experiencing severe problems in the absence of a leader and it did not know when he was going to return. (Doc. 23 at 29, Doc. 33 at 15). These are legitimate, non-discriminatory reasons for Alwood's replacement as district manager. Therefore, the burden shifts to Alwood to put forth evidence that Ecolab's reasons are pretextual. *Rolison*, 111 P.3d at 207.

### 2. Pretext

Alwood has two avenues available for showing that Ecolab's legitimate explanation for filling his position is actually a pretext for retaliation. *Hafner*, 268 886 P.2d at 953. Pretext may be proved directly, by persuading the court that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the employer's proffered explanation is unworthy of credence.

---

[1] Ecolab points out that Alwood did not plead in his Complaint that Ecolab terminated him in retaliation for filing a complaint of discrimination. Accordingly, the Court limits him to this theory and does not analyze that contention. *See Patel v. City of Long Beach*, 564 Fed. Appx. 881, 882 (9th Cir. 2014).

*Hearing Aid Inst. v. Rasmussen*, 372, 852 P.2d 628, 632 (Mont. 1993); *see also Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003).

There is substantial credible evidence sufficient to persuade the Court that a reasonable trier of fact could find that Ecolab's proffered explanation for replacing Alwood as district manager is unworthy of credence. Ecolab's contention that its business suffered during and because of Alwood's absence seems to be contradicted by the evidence in the record. At the time Alwood was replaced, Alwood's region was at the top of all of the districts in the Rocky Mountain region in terms of projected year end percentage of budget and retained key percentage at the time. (*Salstrand Depo.* 219:15-220:7, Doc. 31-2). This weighs against Salstrand's assertion that the District was in dire straits. Similarly, Brian Last, the individual tasked with managing the Billings District while Alwood was out, testified that Ecolab did not experience any sales loss during Alwood's absence nor did he recall dealing with any personnel issues in the Billings District while Alwood was absent. (*Last Depo.* 15:1-5, Doc. 31-1)

Similarly, a trier of fact could find that Ecolab's contention that legitimate business problems in the Billings District caused it to replace Alwood is unsupported by the record. While Salstrand testified that district managers are responsible for team leadership of territory managers and route sales managers, he could not remember traveling to Montana while Alwood was out, (*id.* at 122:23-

19

123:10), and he testified that he never considered any other option for the district manager position other than replacing Alwood. (*Id.* at171:4-8, Doc. 31-2) Even when things were allegedly "boil[ing] over in Montana" and Pariseau advised him that "legal would not approve a replacement," Salstrand did not contact Alwood regarding his return or to tell him that Ecolab was considering his replacement, (*id.* 178:24-179:14), nor did he look into temporarily filling the position or giving another employee a temporary promotion to assist with the "lack of leadership" while Alwood was out. (*Id.* at 171:4-14) This evidence casts doubt on Ecolab's contention that severe business issues directly related to Alwood's absence existed at the time he was replaced.

Although Ecolab argues that it replaced Alwood because it did not know when he was going to return, a jury could find from the evidence that Salstrand never attempted to discover Alwood's return date. Salstrand admitted in his deposition that after his initial email to Alwood, he did not contact Alwood during Alwood's absence for any reason, including his return date, because he "felt bad for him." (*Id.* at 113:23-114:2). This is true despite the fact that Bjorkman advised Salstrand he should "ask the employee an expected time to come back to work" and "stay connected with your employee on leave," in her August 15, 2013, email. (Doc. 31-5).

Similarly, Ecolab's Short Term Disability Toolkit that Bjorkman forwarded to Salstrand advised Salstrand that he should "maintain contact with the employee" and "keep HR generalist updated with information received from employee." (Doc. 31-19 at 2). Despite these promptings, Salstrand did not contact Alwood when things began to "boil over" less than a month after Alwood was gone, or before he inquired with Pariseau about replacing Alwood in September, or before replacing Alwood with Bryan Gentry in November. (*Salstrand depo.* at 113:23-25, Doc. 31-2). In fact, Ecolab's first time reaching out to Alwood for an update on his condition was through Burgess on or about November 1, 2013. (*Alwood Depo.* at 156:12-23, Doc. 31-4). Ecolab replaced Alwood the same day. (Doc. 31-12). Based on these facts, a reasonable trier of fact could conclude that Ecolab's proffered explanation that it did not know when Alwood would return is merely pretextual.

Based on the above, the Court concludes that there is sufficient evidence in the record from which a reasonable trier of fact could conclude that Ecolab's stated reasons for replacing Alwood as district manager were in fact pretextual. Accordingly, summary judgment on Alwood's retaliation claim is not appropriate.

### C. Wrongful Discharge

Finally, respecting Alwood's claim for wrongful discharge based on lack of good cause, Ecolab argues that it properly terminated Alwood's employment

pursuant to its non-discriminatory policy after Alwood failed to secure a new position. (Doc. 33 at 16). Ecolab argues that it had a "legitimate business reason" in terminating the employment of someone no longer interested in working for the company. (*Id.*)

Montana's Wrongful Discharge from Employment Act states:

(1) A discharge is wrongful only if:

> (a) it was in retaliation for the employee's refusal to violate public policy or for reporting a violation of public policy;
>
> (b) the discharge was not for good cause and the employee had completed the employer's probationary period of employment; or
>
> (c) the employer violated the express provisions of its own written personnel policy.

Mont. Code Ann. § 39-2-904. Alwood raises claims under subsections (b) and (c). Since the statute is disjunctive, Alwood need only succeed on one of his claims for his discharge to be wrongful under the WDEA.

### 1. Good Cause

An employee is wrongfully discharged if "the discharge was not for good cause and the employee had completed the employer's probationary period of employment." *Id.* "Good cause" is defined as "reasonable job-related grounds for dismissal" based on either: (1) "failure to satisfactorily perform job duties"; (2) "disruption of the employer's operation"; or some other (3) "legitimate business reason." Mont. Code Ann. § 39-2-903(5).

22

A "legitimate business reason" as one that "is neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." *Buck v. Billings Montana Chevrolet, Inc.*, 811 P.2d 537, 540 (Mont. 1991). While an employer has the important right to exercise discretion over who it will keep in its employ, *McConkey v. Flathead Electric Co-op.*, 125 P.3d 1121, 1126 (Mont. 2005), "[o]f equal importance [], is the legitimate interests of the employee to secure employment." *Buck*, 811 P.2d at 540.

In order to "defeat a motion for summary judgment on the issue of good cause, the employee may either prove that the given reason for the discharge is not 'good cause' in and of itself, or that the given reason 'is a pretext and not the honest reason for the discharge.'" *Becker v. Rosebud Operating Services, Inc.*, 191 P.3d 435, 441 (Mont. 2008). The employee must present "evidence, and not mere speculation or denial," to create an issue of fact. *Kestell v. Heritage Health Care Corp.*, 858 P.2d 3, 7 (Mont. 1993).

Here, Ecolab allegedly discharged Alwood because he failed to identify a new position within 56 days of being cleared to return to work. Ecolab argues that because it could not be expected to continue employing Alwood when he remained uninterested in any open positions, it had a "legitimate business reason" to discharge him. (Doc. 23 at 31). On its face, the reason given by Ecolab for terminating Alwood's employment qualifies as good cause. The undisputed

23

evidence demonstrates that Ecolab's "standard procedure" is to allow thirty days for an employee in "similar circumstances" to identify and apply for open positions. (Doc. 31-24). In the event that the employee fails to identify and obtain a position, he will be severed from the company. (*Id.*)

While the reason given by Ecolab for Alwood's discharge is in and of itself good cause, Alwood's claim may survive summary judgment if he can show there is a genuine issue of material fact as to whether that reason was simply a pretext and not the honest reason for his discharge. *See Becker*, 191 P.3d at 441.

## 2. Pretext

Alwood asserts that the manner and timing of his termination evidences that Ecolab's reason for discharging his employment is pretextual. Alwood points out that even though he was cleared to work on December 16, 2013, he did not receive any information regarding his position in the company, to whom he should report, or even how he would be paid, until January 2, 2014, and that was only after significant urging on his part. Notably, the website Bjorkman provided to him on January 2, 2014, to search for jobs did not allow him to search for positions equivalent to the one he previously held, district manager. She provided those positions to him on January 13, 2014, 28 days after he had been cleared to work, and only after Alwood pointed the omission out to her. Alwood also pointed out that Bjorkman never consulted with Salstrand, who was in the best position to

24

know what positions may be coming available in the Rocky Mountain District. In fact, just after Alwood was terminated, two positions became available.

This Court finds the evidence persuasive. A trier of fact could reasonably find that Ecolab's explanation that Alwood was terminated because he did not find a position in the company within its standard 30 day window is pretextual based on the fact that Ecolab failed to communicate with Alwood for the first half of the standard 30 days, and it failed to provide him with job opportunities suitable for his position for 28 days. Based on this timeline, by terminating his employment 56 days after he was cleared to work, Ecolab essentially provided Alwood with 28 days to find a position. Further, there is sufficient evidence for a jury to determine that Ecolab was willing to extend the standard 30 day timeline for its own failure to timely assist Alwood in finding a position, but when two suitable positions for Alwood were on the horizon, Ecolab ended the extension and terminated Alwood based on its "standard procedure."

Similarly, a jury could find Ecolab's assertion that it terminated Alwood because he did not want to work for the company pretextual. Alwood was a district manager for 15 years before Ecolab replaced him. No comparable job was available in the area and he would have been required to pay his own relocation expenses many states away for a comparable position. Despite that, Alwood applied for a job he thought he could do out of Montana and did not get it.

Whether these actions and explanations suggest that Alwood wanted to remain at Ecolab are for the trier of fact.

## IV.    Conclusion

For the foregoing reasons, IT IS HEREBY ORDERED that Ecolab's motion for summary judgment is GRANTED as to Alwood's age discrimination claim and DENIED as to all other claims.

DATED this _11_ day of April 2016.

SUSAN P. WATTERS
United States District Judge