IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION



FILED

MAR 2 8 2017

Clerk, U.S. District Court
District Of Montana
Billings

| | |
|---|---|
| ROBERT ALWOOD,<br><br>        Plaintiff,<br><br>vs.<br><br>ECOLAB, INC.,<br><br>        Defendant. | CV 14-101-BLG-SPW<br><br>FINDINGS OF FACT,<br>CONCLUSIONS OF LAW and<br>ORDER |

This matter was tried on October 31, 2016 through November 3, 2016 before

Judge Susan Watters, sitting without a jury. Alex Rate of Rate Law Office, P.C.

and Justin Stalpes of Beck, Amsden and Stalpes, PLLC, represented Plaintiff

Robert Alwood. William Mattix of Crowley Fleck, PLLP, and Roy Ginsburg and

Andrew Peters of Jones Day represented Ecolab, Inc. Numerous exhibits were

offered and admitted, and deposition excerpts from Ecolab employees Scott

Salstrand, Katie Bjorkman, Shelly Burgess, Marina Pariseau and Brian Last were

admitted for use in Alwood's case-in-chief. The issues at trial were Ecolab's

liability for disability discrimination and retaliation against Alwood. Having heard

the evidence and reviewed the proposed Findings of Fact and Conclusions of Law

of both parties, the Court now makes the following:

## FINDINGS OF FACT

### I.    Procedural History

1.    Alwood filed this lawsuit on July 17, 2014, in Montana state court. (Doc. 1-1). On August 12, 2014, Ecolab removed the case to the United States District Court for the District of Montana. (*See gen. id*).

2.    In his lawsuit, Alwood asserted four claims: a) disability discrimination; b) retaliation; c) age discrimination; and d) wrongful discharge under the Wrongful Discharge from Employment Act, Mont. Code Ann. §§ 39-2-901, *et seq.* (Compl. ¶¶ 45-79, Doc. 1-1).

3.    On November 16, 2015, Ecolab moved for summary judgment on Alwood's claims. (Doc. 22).

4.    In response to Ecolab's Motion for Summary Judgment, Alwood agreed to dismiss his claim for age discrimination (Count III of Alwood's Complaint). (Doc. 29). On April 12, 2016, the Court entered an Order dismissing Alwood's age discrimination claim, but denying Ecolab's Motion in all other respects. (Doc. 36). Trial was scheduled. (Doc. 76).

5.    On September 7, 2016, Alwood voluntarily dismissed his wrongful discharge claim (Count IV of his Complaint). (Doc. 75, 76).

6. Alwood's two remaining Counts – disability discrimination and retaliation – were tried before this Court over four days, beginning on October 31, 2016. (*See generally*, Trial Tr., Docs. 111-15).

7. Alwood's case-in-chief lasted approximately two days. (Trial Tr. 516:1). At the conclusion of Alwood's case-in-chief, Ecolab moved the Court to dismiss Alwood's claims under the Federal Rules of Civil Procedure. (*Id.* at 516:5-9, 524:18-20). The Court ruled that it was unable to grant Ecolab's Motion in part because it had not yet had an opportunity to review the portions of the deposition transcripts Alwood had submitted as part of his case-in-chief. (*Id.* at 536:4-6). The Court took the matter under advisement. (*Id.*).

8. Ecolab's defense lasted approximately two more days. (*Id.* at 993:20). After presenting its defense, Ecolab renewed its Motion to Dismiss Alwood's lawsuit. (*Id.* at 1007:20-23). Again, the Court took the motion under advisement. (*Id.* at 1007:25).

9. Following the conclusion of the trial, the Court ordered the parties to submit Proposed Findings of Fact and Conclusions of Law. (*Id.* at 996:17-20, 1000:4-5).

## II. The Parties

10. Ecolab is a Delaware Corporation with its principal place of business in St. Paul, Minnesota. (Final Pre-Trial Order § IV ("Agreed Facts") ¶ 2, Doc. 81).

11.    Ecolab is a water, hygiene, and energy solutions company, employing people throughout the state of Montana, the United States, and the world. (Trial Tr. 115:22-116:11).

12.    Ecolab has several divisions. (*Id.* at 541:6-9). The Company's Institutional Division primarily services the hospitality industry, which includes hotels, food service, and health care facilities. (*Id.* at 546:8-13).

13.    The Institutional Division is divided into three regional sales units: (1) Areas, (2) Districts, and (3) Territories. (Agreed Facts at ¶ 3, Doc. 81). The Areas, which are managed by Area Managers ("AMs"), encompass Districts, which are managed by District Managers ("DMs"). (*Id.*). The Districts are made up of multiple Territories, each of which is overseen by a Territory Manager ("TM"). (*Id.*).

14.    The Institutional Division encompasses three geographical regions in the U.S. – the West, South and North. (Trial Tr. 878:14-16). The West Region encompasses the area from Minnesota to the West Coast, as well as Alaska and Hawaii. (*Id.* at 878:7-9.) Seven Areas exist within the West Region, one of which is the Rocky Mountain Area. (*Id.* at 879:1-5). The Billings District is within the West Region. (*Id.* at 879:21-23).

15. There are approximately 5000 employees in Ecolab's Institutional Division in the U.S. (*Id.* at 882:23-25). Approximately 1000 of those employees worked in the West Region. (*Id.* at 883:2-4).

16. The number of Districts in each Area remains relatively constant, typically between 10 and 12 Districts per Area. (*Id.* at 883:8-11).

17. Alwood resided in Billings, Montana and worked for Ecolab. (Agreed Facts ¶¶ 1, 4, Doc. 81).

## III. Alwood's Employment with Ecolab

18. Ecolab hired Alwood on January 17, 1990. (*Id.* at ¶¶ 4, 7). Alwood remained an Ecolab employee until February 6, 2014. Alwood worked in the Company's Institutional Division for his whole career. (*Id.*).

19. In 1998, Ecolab promoted Alwood to the position of DM for the Billings District. (*Id.* at ¶ 6). The Billings District is a very large Ecolab sales region located in the Rocky Mountain Area ("RMA"). (Trial Tr. 191:9-11; 564:4-18; Ex. 320, Doc. 103-4 at 293). The Billings District includes nearly the entire state of Montana, as well as parts of northern Wyoming. (*Id.* 191:12-24; 581:11-18; Ex. 320, Doc. 103-4 at 294).

20. The DM is the "most senior position in a District." (*Id.* at 189:23-25). As the Billings DM, Alwood was responsible for hiring, leading and managing

TMs throughout Montana so that Ecolab could achieve sales and customer satisfaction goals. (Agreed Fact at ¶ 8, Doc. 81).

21. Throughout most of his tenure as the Billings DM, there were ten territories within the Billings District, each of which had a TM. All ten TMs reported to Alwood. (Trial Tr. at 191:25-192:3-8).

22. The DM trains and coaches the TMs on the best ways to manage their business and their time, meet their personal objectives, install equipment properly, and develop their overall skills so that they might be promoted to other roles in the future. (*Id.* at 552:10-23; 588:3-9). As part of this training and coaching, DMs are supposed to visit key customers with the TMs, as well as conduct "ride-alongs" with each TM at least once per month. (*Id.* at 587:14-17; 588:3-9).

23. As the Billings DM, Alwood had direct and overall responsibility for cultivating relationships with Ecolab's customers in the District and ensuring that Ecolab properly served those customers. (*Id.* at 586:23-587:9). This included developing new business, maintaining existing business, and addressing problems that might arise with customers, something Alwood stated he had to do "daily." (*Id.* at 194:17-23).

24. Alwood described the DM job as "intense," "stressful," and "a difficult position." (*Id.* at 195:16-18, 195:19-20, 195:21-22, 554:18-555:1).

25.     Throughout Alwood's tenure as a DM, he reported to multiple Area Managers ("AM"). (*Id.* at 196:4-7).

26.     Salstrand became Alwood's AM and direct supervisor in 2012. (*Id.* at 130:7-15). Salstrand was located in Denver, Colorado. (*Id.*).

## IV.   Alwood's Mental Health Issues

27.     In the spring of 2013, Alwood began suffering work-related anxiety and depression. (*Id.* at 16:5-8; 134:3-7).

28.     As of March 2013, Alwood had not told Salstrand or anyone else at work about any mental health issues he was experiencing. (*Id.* at 198:5-8).

29.     On or about March 29, 2013, Salstrand provided Alwood with a Written Warning regarding certain aspects of Alwood's performance. (*Id.* at 197:3-6, 13-17; Ex. 111, Doc. 103-2 at 23).

30.     In the Written Warning, Salstrand identified three areas where Alwood could improve his performance. (*Id.* at 201:2-4 and Ex. 111, Doc. 103-2 at 23). This included Alwood's failure to prepare Field Trip letters, meeting deadlines, and failure to adequately support his TMs. (*Id.* at 201:5-6; 202:3-7). Salstrand was concerned that one of Alwood's recent TM hires had left Ecolab and that another TM, Terry Eckhard, complained about Alwood's lack of support in the field. (*Id.* at 202:8-20, 202:21-24, 203:3-10). Salstrand also advised Alwood that

unprofessional, negative, rude, and insubordinate behavior would not be tolerated. (*Id.* at 203:21-204:4).

31. As both Alwood and his wife, Raye Alwood, described in April 2013, Alwood had a "breakdown." (*Id.* at 198:2-199:2, 217:7-10, 473:7-15).

32. In May, 2013, Alwood began seeing Billings-based therapist, Karen Kietzman. (*Id.* at 55:12-13). Kietzman diagnosed Alwood with severe depression and anxiety. (*Id.* at 16:5-8; 134:3-7). Kietzman's perceptions at that time were that Alwood's "work satisfaction was decreasing" and he was "concerned about his future and [his] job security." (*Id.* at 55:6-11).

33. Alwood underwent cognitive behavioral treatment as a result of his depression, but Kietzman did not recommend that he take a leave of absence from work. (*Id.* at 17:9-12; 17:19-22).

34. Kietzman referred Alwood to a medical doctor (Dr. Wagenaar). (*Id.* at 220:2-6). On May 17, Alwood told Dr. Wagenaar that he had become overwhelmed with depression and anxiety. (*Id.* at. 221:15-17). Dr. Wagenaar put Alwood on anti-depressant medications. (*Id.* at 221:22-24).

35. Alwood testified that he was not really able to focus and felt that the stress he was experiencing was attributable to pressures at work. (*Id.* at 199:10–200:22, 215:3-5).

8

36.     Alwood's mental health problems worsened during the four-month period spanning May through August. (*Id.* at 224:6-10). He felt that he was "falling into a deeper depression and anxiety due to work and lack of support." (*Id.*). His depression was exacerbated because he had to "run his District" by himself and there were vacancies among the TM positions. Because of the TM vacancies, he had to spend "many, many, many, many hours and days and weeks" on the road. (*Id.* at 225:11-20).

37.     In early August, Alwood received a Final Written Warning for being verbally abusive to a vice president in Ecolab's supply chain. (*Id.* at 209:3-5, Ex. 13, Doc. 103-1 at 18).

38.     Alwood had not informed Salstrand that he was suffering from severe anxiety or depression when Salstrand gave him the Final Written Warning. (*Id.* at 284:3-11).

39.     Three days after receiving his Final Written Warning, Alwood had another session with Kietzman. (*Id.* at 226:17-22). At that session, Kietzman recommended that Alwood stop working. (*Id.* at 226:23-25, 64:16-18). She felt that Alwood's mental health issues were becoming more severe. (*Id.* at 64:11-15). Kietzman felt that the problems Alwood was experiencing at work were causing him "undue stress." (*Id.* at 64:25 - 65:3).

9

40.    Kietzman prepared a letter to Ecolab dated August 13, 2013,

recommending that Alwood take a leave of absence. (*Id.* at 227:10-17; 65:14-17;

66:2-6; Ex. 100, Doc. 103-2 at 9). She stated that Alwood suffered from anxiety

and depression and recommended that Ecolab release Alwood from work and place

him on Short-Term Disability. (*Id.* at 228:2-5). Kietzman noted that Alwood's

"depression had worsened, even with treatment." (*Id.* at 68:10-16). Kietzman did

not provide a return to work date. (*Id.* at 75:4-9; and 228:10-12).

## V.    Alwood's Leave of Absence

41.    At the time Alwood went out on leave, the Billings District was the

only district in the RMA meeting the aspirational budget set by Ecolab

management. (*Id.* at 136:11-15).

42.    Alwood sent Kietzman's letter to Shelly Burgess, a Disability Case

Manager in Ecolab's Human Resources Department. (*Id.* at 227:24–228:1, 886:1 -

887:10; 889:1-6). Burgess was responsible for communicating with the employee

going out on leave, answering questions, reaching out to the employee's physician,

providing documentation to the employee, and conducting the requisite follow-up.

(*Id.* at 886:13-20).

43.    When Alwood sent Kietzman's letter to Burgess, he did not know

how long he would be out of work. (*Id.* at 229:2-13). Alwood testified that at the

time he went out on leave, Kietzman had not advised him of when he might be able to return to work. (*Id.* at 229:19-22, 230:1-11).

44.     Alwood did not tell anyone in his chain-of-command, including Salstrand, that he was taking leave. (*Id.* at 230:12-15).

45.     After Alwood sent in Kietzman's August 13 letter to Burgess, she told Alwood to stop working. (*Id.* at 231:16-18). She told him she would send him Ecolab's Short-Term Disability packet, which included Ecolab's Short-Term Disability Policy. (*Id.* at 232:13-16, Ex. 200, Doc. 103-3 at 21-23). Alwood stopped working on August 15, 2013. (*Id.* at 232:17-20).

46.     On August 15, 2013, the day Alwood's leave commenced, Burgess wrote to him and provided him a copy of Ecolab's Short-Term Disability policy. (Ex. 200, Doc. 103-3 at 21-23).

47.     On page 2 of Ex. 200, following the heading, "Returning to Work," Ecolab's policy stated: "Ecolab will make reasonable efforts to reinstate employees returning from medical leaves into positions of equal status and pay. But reemployment is not guaranteed." (Ex. 200, Doc. 103-3 at 22; Trial Tr. 339:6-340:1).

48.     Ecolab's policy also clarified that "an individualized analysis will be reviewed for each situation" and "[r]eemployment is dependent on the length of the leave, whether the date of return is definite or indefinite, successful recovery or

rehabilitation from the disability, and availability of a position." (*Id.*; Trial Tr. 340:9-24).

49. On August 15, 2013, Burgess provided Alwood the disability paperwork he needed to complete. (*Id.* at 234:7-17; Ex. 316, Doc. 103-4 at 215-217). In an accompanying letter, she also outlined the information Ecolab would need for Alwood to commence his Short-Term Disability leave. (*Id.*) She stated that his physician should "note the release date of your return to work." (*Id.* at 235:22 - 236:4). She also advised Alwood, "[i]f your doctor is unsure of your return to work date, she or he should provide me, at a minimum, monthly updates." (*Id.* at 236:6-10). Alwood knew that he and Kietzman were to provide Ecolab at least monthly updates regarding when he might be able to return to work, but failed to tell Kietzman that she needed to provide Burgess with updates regarding his condition on at least a monthly basis. (*Id.* at 80:6-17; 236:11-15).

50. During the time Kietzman treated Alwood, she completed the required forms and Alwood sent them in to Ecolab. (*Id.* at 72:11-17). Kietzman did not send any forms or correspondence to Ecolab directly. (*Id.* at 80:18-20).

51. After she sent Alwood the Short Term Disability Policy, Burgess also notified Ecolab Human Resources Representative Katie Bjorkman that Alwood would be out on leave. (*Id.* at 886:1-5; 888:1-6). Bjorkman, in turn, notified Salstrand via email that Alwood was out on leave. (*Id.* at 623:9-:624:22; Ex. 4,

12

Doc. 103-1 at 1-2). In the same email, Bjorkman advised Salstrand that it is a "best practice" to check in with Alwood throughout his leave and ask about an expected return to work date. (Ex. 4, Doc. 103-1 at 1-2). Bjorkman also forwarded Salstrand Ecolab's "Short-Term Disability Supervisor/Manager Toolkit (the "Toolkit"), which explained the responsibilities of the employee and his or her manager while the employee is on Short-Term Disability Leave. (Ex. 4, Doc. 103-1 at 1-2; Ex. 30, Doc. 103-2 at 2). As provided in the Toolkit, an employee who takes leave is responsible for notifying his supervisor of the need for leave. (Ex. 30, Doc. 103-2 at 2). The Toolkit further advises the supervisor to "maintain contact with the employee as directed by the HR generalist." (*Id.*).

52. An Ecolab employee on Short-Term Disability leave who has been with the Company for at least ten years, such as Alwood, receives 100 percent of his or her compensation during the leave period, as well as a continuation of benefits. (*Id.* at 903:23-904:6). Ecolab employees are required to use the Short-Term Disability leave before they seek Long-Term Disability benefits. (*Id.* at 904:15-905:4).

53. Salstrand e-mailed Alwood on August 15, 2013, wishing him a speedy recovery. (*Id.* at 241:6-10; Ex. 101, Doc. 103-2 at 10). Alwood did not respond. (*Id.* at 629:17-630:1). Salstrand later called Alwood and left him a voicemail. (*Id.*

13

at 630:5-17). Alwood did not return Salstrand's call. (*Id.*) Salstrand did not attempt to contact Alwood again. (Salstrand Depo. 111:25-112:4; Doc. 109)

54.     On September 6, 2013, Kietzman and Alwood filled out and sent in the blank Attending Physician's Statement of Disability form ("SOD") that Burgess had included with her August 15, 2013 letter to Alwood. (*Id.* at 81:4-13; Ex. 125, Doc. 103-2 at 48).

55.     In the SOD, Kietzman described Alwood's mental impairment as, "feels demoralized, stressed, anxious, depressed, helpless, unable to feel capable of doing his job." (*Id.* at 86:24 - 87:12). She described him as "totally disabled." (*Id.* at 253:7-20; Ex. 125, Doc. 103-2 at 48). Kietzman did not provide an anticipated return to work date in the blank space on the SOD. Instead, she wrote "unknown," and that his "[r]eturn to work will depend on response to treatment." (*Id.* at 88:6-8, 88:24-89:5, Ex. 125, Doc. 103-2 at 48). Kietzman did not provide a prognosis or length of treatment on the SOD form. (Ex. 125, Doc. 103-2 at 48).

56.     Kietzman invited Ecolab to contact her if it had any questions regarding Alwood's status, including his return to work capacity. (Ex. 100, Doc. 103-2 at 9). However, Ecolab never contacted Kietzman. (Trial Tr. 26:23-25).

57.     Neither Kietzman nor Alwood had any further direct or indirect contact with Burgess in September 2013, (*id.* at 89:22-25; 255:9-12), and

14

Kietzman did not provide any more information to Ecolab during the month of October 2013. (*Id.* at 90:1-7).

58.     Alwood sent Ecolab Kietzman's letter stating that Alwood needed to take leave on August 13, 2013. (*Id.* at 139:8-11). By August 15, Burgess had contacted Alwood advising him that his leave request would likely be approved. (*Id.* at 139:10-11, 890:7-19, 891:3-6). By the same date, Bjorkman had contacted Salstrand to inform him that Alwood would be on an indefinite leave of absence. *Id.* at 889:10-16. No additional information was provided by Ecolab's HR Department to Salstrand during August regarding the potential duration of Alwood's leave. (*Id.* at 802:14-803:6).

59.     Kietzman continued to treat Alwood during the September and October time period. (*Id.* at 90:8-11).

## VI.     Alwood's Letter to Ecolab CEO Doug Baker

60.     In the latter part of September 2013, after he had been on leave for approximately four weeks, Alwood wrote an eight-page letter to Ecolab's CEO, Doug Baker ("Baker"). (*Id.* at 255:24-256:4). In it, Alwood included what he considered the important issues he and Ecolab were confronting at the time the letter was written. (*Id.* at 257:8-13). He told Baker that Ecolab was "losing major accounts in Montana," and that the Billings District TMs' "relationships were strained to the max." (*Id.* at 260:12-14, 260:23-261:3; Ex. 116, Doc. 103-2 at 29-

37). Alwood described the TM position to Baker, and noted that the role is "very complicated," and requires a 24/7, 365-day/year commitment. (*Id.* at 266:21-25, 267:1-3). Alwood stressed that the job pressures were exacerbated in a rural market [like the Billings District], where TM personnel did not have coverage options. (*Id.* at 267:9-13). He explained that he had to ask TMs to cover territories that were 85 miles away from their home territories, or 60 miles away, while lamenting the fact that they had no options ("As a team, when we would have somebody go out [e.g., vacation, illness], we have to cover the business.") (*Id.* at 269:21-270:1).

61. Alwood explained the difficulties associated with hiring in certain markets of the Billings District, and how few applicants there were for TM jobs in the District. (*Id.* at 269:13-20). Alwood stressed that he was "lucky to even find applicants," particularly in light of the hour demands of the job and the lack of coverage for weekends and vacations. (*Id.* at 267:20-23).

62. Alwood told Baker that the employees in Montana were working extremely hard. (*Id.* at 267:14-16). He said that the TMs in the Billings District were losing income and business that could not be replaced in a rural market. (*Id.* at 261:7-11). Alwood said that the "Montana team" had been excluded in certain ways and that, he as the DM had not been supported as he should have been. (*Id.* at 264:12-17). Alwood partially described the Final Written Warning he had

16

received and told Baker that he was "threatened with losing [his] job because of incompetence." (*Id.* at 261:21-262:16). Nowhere in his letter did he mention that he was threatened with losing his job because of disability discrimination or retaliation. (*Id.* at 262:25-263:21).

63.    After describing all of these serious problems, Alwood pointed out the combination of these factors resulted in a diminution of his own performance as a DM: "running vacant territories this geographically large with no applicants in sight for recruiting, trying to do the right thing and protect the business in multiple markets, many of my DM responsibilities suffer. Because of commitments to customers, I was not able to spend time with the rest of the team." (*Id.* at 270:8-16).

64.    As to customers, Alwood stated: "The final wave begin [*sic*] to crest because we were losing large accounts." (*Id.* at 271:2-17). As Alwood emphasized, "We have lost major accounts before, regarding this, and no one seems to care." (*Id.* at 271:21-23). Alwood remarked that in the month he went out on leave, Ecolab had lost a $60,000/year customer, and that this was not the first time this type of customer loss had occurred. (*Id.* at 271:24-272:7; 272:8-11).

65.    On the subject of retaliation, Alwood asserted, "Once again, [he] was being retaliated against for the incompetence of others, not being able to do their jobs well and support the field, and most importantly, our customers." (*Id.* at

17

273:15-24).  Alwood identified Salstrand and the VP of Supply Chain, Kerri

Peterson, as the individuals who were retaliating against him.  (*Id.* at 273:25-

274:19).  Alwood conceded, however, that he was not claiming these two

individuals were retaliating against him because he had a disability or for taking

leave.  (*Id.* at 274:23-275:4).  Rather, Alwood explained to Baker, "I was retaliated

against by Mr. Salstrand and Ms. Peterson because they could not resolve the issue

of getting product to a customer in a timely fashion."  (*Id.* at 275:16 -21).

## VII.  Salstrand's First Request to HR for Options

66.    After Alwood went out on leave, Salstrand planned interim support

for the District.  (Salstrand Depo. 121:11-15, Doc. 31-2).  Customer calls were

routed to Salstrand and another District Manager, Brian Last.  (*Id.* at 124:20-25).

Last understood that he was receiving all customer calls while Alwood was on

disability leave.  (Last Depo. 13:12-15, Doc. 31-1).

67.    Alwood received some communications from Ecolab customers when

he was on leave.  (Trial Tr. at 245:2-8).  Alwood told Burgess, either by phone or

email, that he wanted the customer communication to stop.  (*Id.* at 247:1-4).

68.    Salstrand knew Alwood could not be replaced immediately because

he was on disability leave.  (Salstrand Depo. p. 69:14-16; Doc. 31-2). He relied on

Ecolab's HR department to provide guidance "on exactly how to handle the

situation."  (*Id.* at 69:15-16).

69.    On September 6, 2013, three weeks after Alwood went on leave,
Salstrand emailed Marina Pariseau, who at the time worked as an HR Manager for
the Institutional Division, and asked if there were any "options" with respect to
Alwood's position. (Ex. 7, Doc. 103-1 at 14).

70.    Pariseau told Salstrand that she did not believe any "options" existed
at the time. (*Id.* at 15). She did not believe that putting a TM in place to fill-in for
Alwood for an undefined period was an option, because TMs generally do not have
the skill sets to fulfill all the DM's responsibilities. (Trial Tr. at 805:20-806:3).
She also did not believe having a DM fill in for Alwood was an option, because
doing so would leave another district without coverage while Alwood remained on
indefinite leave. (*Id.* at 806:5-13). At the time, Pariseau believed that the only
options were waiting for Alwood to return, which Ecolab preferred, or naming a
replacement. (*Id.* at 805:7-19; 809:1-6). Because Ecolab's HR Department felt it
was too early to replace Alwood, Pariseau had no good options to offer Salstrand
on how to deal with the problems facing the Billings District. (*Id.* at 806:19-24;
807:1-10).

71.    On September 6, 2013, Kietzman filled out a "Physician's Statement
of Disability," which Alwood provided to Burgess, as requested. (Ex. 125, Doc.
103-2 at 48).

72.     After Alwood went out on leave, the problems in the Billings District intensified. During the period Alwood was on leave, DM tasks were not being completed, causing customer relations problems. (Trial Tr. at 633:13-17; 638:4-15; 773: 6-25).

73.     Town Pump was one of Ecolab's largest customers in the Billings District. (*Id.* at 633:13-17). As the Billings DM, Alwood was responsible for overseeing, assisting, and supporting the TMs who directly serviced Town Pump. (*Id.* at 586:23-587:8, 652:13-22). When a problem arose, or when Town Pump had customer service needs, Alwood was responsible for trying to resolve the issues. (*Id.* at 652:13-22).

74.     Salstrand feared that without a Billings DM to address the customer service issues, the Town Pump business was in jeopardy. (*Id.* at 633:13-17). Town Pump already had discontinued using Ecolab as its hand soap supplier, costing Ecolab roughly $100,000 in business. (*Id.* at 633:18 at 634:1). Moreover, at its newest hotel in Bozeman, Town Pump began buying from Ecolab's main competitor, despite the fact that Ecolab previously had been Town Pump's exclusive hotel provider. (*Id.*). Salstrand found this decision to be "shocking." (*Id.*).

75.     Without a DM to address these problems, Salstrand had to create an action plan with all of the TMs to try to protect this business. (*Id.* at 638:4-15).

Despite these efforts, Salstrand continued to fear that the Company was at imminent risk of losing Town Pump's business. (*Id.*).

76. Salstrand believed the Billings District could not afford to lose Town Pump as a customer. (*Id.* at 638:16-25). As one of the two largest customers in the Billings District, Town Pump accounted for approximately $350,000 in annual sales. (*Id.*). Salstrand believed that the loss of this revenue would constitute a devastating setback from which the Billings District might not recover. (*Id.* at 638:21-25). At the very least, Town Pump had accounts in almost every Territory in the Billings District. (*Id.*). As a result, if Ecolab lost Town Pump as a customer, the TMs would make fewer sales and earn less income. (*Id.*). Salstrand feared that this would result in TMs leaving, exacerbating the staffing challenges Ecolab already was experiencing in the Billings District. (*Id.* at 639:1-6).

77. Salstrand also observed how the absence of a Billings DM was negatively impacting Ecolab's relationship with Sysco Foods. (*Id.* at 632:15-23; 633:13-17; 638:4-10; 773:6-19). Sysco Foods, in addition to being an Ecolab customer, is also the largest distributor of Ecolab products. (*Id.* at 585:18-23). Over half of the Billings District's $6 million in revenue was directly or indirectly attributable to Sysco Foods. (*Id.* at 659:17-23).

78. With Alwood on leave, Ecolab continued to have problems with Sysco Foods in the Billings District. Trial Tr. 633:13-17. Salstrand testified that

he started receiving criticisms from Sysco Foods' VP of Field Sales about the relationship between the two companies. (*Id.* at 773:10-19). Moreover, the TMs also expressed concerns about the inadequate support they were receiving with respect to Sysco Foods. (*Id.* at 638:4-10).

79.     Sysco Foods also directly distributed Ecolab's products to Town Pump. (*Id.* at 639:1-15). As a result, when Ecolab started losing Town Pump's business, it also affected Sysco Foods' revenue. (*Id.*). This further strained the relationship between Ecolab and Sysco Foods. (*Id.*).

80.     Salstrand feared that Sysco Foods, like Town Pump, would begin turning to Ecolab's competitors, the repercussions of which would have been "devastating" and "catastrophic." (*Id.* at 639:7-15; 662:1-663:6).

81.     In addition to Town Pump and Sysco Foods, Salstrand also was receiving feedback from the District's TMs that many other customers were upset about the level of service they were receiving during Alwood's absence. (*Id.* at 634:8-16). Salstrand feared losing these customers to competitors as well. (*Id.*).

82.     Salstrand also had concerns about the impact Alwood's absence was having on employee morale. (*Id.* at 632:15-22). In particular, there were multiple territory managers who were struggling. (*Id.*). Two managers-Chris Blueher and Terry Eckard-told Salstrand that they were going to leave Ecolab because they were not getting the support needed. (*Id.* at 632:15-22, 638:8-13). Chris

he started receiving criticisms from Sysco Foods' VP of Field Sales about the relationship between the two companies. (*Id.* at 773:10-19). Moreover, the TMs also expressed concerns about the inadequate support they were receiving with respect to Sysco Foods. (*Id.* at 638:4-10).

79.    Sysco Foods also directly distributed Ecolab's products to Town Pump. (*Id.* at 639:1-15). As a result, when Ecolab started losing Town Pump's business, it also affected Sysco Foods' revenue. (*Id.*). This further strained the relationship between Ecolab and Sysco Foods. (*Id.*).

80.    Salstrand feared that Sysco Foods, like Town Pump, would begin turning to Ecolab's competitors, the repercussions of which would have been "devastating" and "catastrophic." (*Id.* at 639:7-15; 662:1-663:6).

81.    In addition to Town Pump and Sysco Foods, Salstrand also was receiving feedback from the District's TMs that many other customers were upset about the level of service they were receiving during Alwood's absence. (*Id.* at 634:8-16). Salstrand feared losing these customers to competitors as well. (*Id.*).

82.    Salstrand also had concerns about the impact Alwood's absence was having on employee morale. (*Id.* at 632:15-22). In particular, there were multiple territory managers that were struggling. (*Id.*). Two managers-Chris Blueher and Terry Eckard-told Salstrand that they were going to leave Ecolab because they were not getting the support needed. (*Id.* at 632:15-22, 638:8-13). Chris

22

complained that he was so "frustrated" because he was short-staffed, and Salstrand had to send people from other districts to help him. (*Id.* at 640:1-7).

## VIII. Salstrand's Second Request to HR for Options

83.    On September 24, 2014, approximately six weeks after Alwood began his indefinite leave, Salstrand again e-mailed Pariseau, this time informing her that "things are beginning to boil over in Montana." (Ex. 7, Doc. 103-1 at 14). He noted that "this is a very difficult team to manage due to extreme geography and rural territories . . ." Salstrand expressed the concern that "if we wait much longer, the business and personnel losses will be quite substantial." (*Id.*).

84.    By late October 2013, Salstrand still had heard nothing from Ecolab's HR Department, or from Alwood himself, about Alwood resuming his role at Ecolab. (Trial Tr. 640:21-641:11). As a result, Salstrand approached Bryan Gentry, a TM working in Denver, Colorado, about the possibility of him taking over as the Billings DM. (*Id.* at 646:12-20).

85.    In order to gather more information regarding Alwood's potential return to work, on November 1, 2013, Burgess reached out to Alwood and spoke to him by telephone. (*Id.* at 291:12-19). Alwood understood that the purpose of Burgess's call was to explore when he might be able to return to work. (*Id.* at 291:20 -292:10). In response to Burgess's inquiries, Alwood told her that he did not know when he might be able to return to work. (*Id.* at 292:11-18). Alwood

23

conceded that during this call, he did not tell her that he might be able to return to work in mid-December. (*Id.* at 294:3-7).

86.    On November 6, 2013, Alwood sent Burgess an email: "Shelly, I contacted my doctor and she said she would be glad to give you an update but the request needs to come directly from you. Please contact her with the proper paperwork request." (Ex. 202, Doc. 103-3 at 27). In response, Burgess emailed Alwood another Attending Physician Form. (Ex. 203, Doc. 103-3 at 28).

87.    Because the November 1, 2013 phone call confirmed that Alwood still could not provide a potential return date, Ecolab approved the hiring of a new Billings DM. (*Id.* at 647:5-648:2). Upon receiving this approval, Salstrand offered the position to Gentry, who accepted the offer. (*Id.*). The Rocky Mountain Region announced that Gentry would be assuming the role of Billings DM on November 7, 2013. (*Id.* at 648:8-20; Ex. 8, Doc. 103-1 at 17). Gentry started in this role soon thereafter. (Trial Tr. at 653:23-25). At the time that Gentry was appointed to the Billings DM position, Salstrand still did not know when, or even whether, Alwood would return to work. (*Id.* at 647:14-16).

88.    Alwood first learned that Ecolab had filled the Billings DM position from another DM out of Denver, Brian Last. (*Id.* at 295:10-14). After learning his position had been filled, Alwood did not reach out to Salstrand or Dahl and he

24

never told either of them that he would like to return to Ecolab or return to his role as DM for the Billings District. (*Id.* at 296:2-17).

89.     Because he believed that Ecolab's leave policies required Ecolab keep his position vacant for 180 days, Alwood was surprised to learn he had been replaced. (*Id.* at 296:15-17). Alwood conceded however, that Ecolab's Disability Policy states "reemployment is not guaranteed." (*Id.* at 339:10-341:2).

## IX.     Alwood's Return to Work

90.     Alwood obtained a new SOD, dated November 12, 2016. (*Id.* at 298:13-18; 299:7-12; Ex. 204, Doc. 103-3 at 29). This SOD provided for an anticipated return to work date of December 16, 2013. (*Id.* at 102:1-3; 297:8-298:24; Ex. 204, Doc. 103-3 at 29). To the right of the return to work date, Kietzman wrote "Possibly." (*Id.* at 102:4-6). Kietzman also observed that it was "unknown" whether a job modification would enable Alwood to work without impairment. (*Id.* at 102:7-10). As of mid-November 2013, Kietzman believed that Alwood would return to Ecolab in a "part-time" capacity. (*Id.* at 102:15-18).

91.     Although Kietzman proposed part-time work in the November 12 SOD, Alwood acknowledged that the responsibilities of the Billings DM could not be fulfilled on a part-time basis. (*Id.* at 103:21-104:7).

92.     On December 16, 2013, Kietzman wrote a short letter to Ecolab, advising the Company that Alwood was ready to return to work without

restrictions. (*Id.* at 103:5-17; Ex. 102, Doc. 103-2 at 11). Upon receipt of Kietzman's December 16 correspondence, Burgess sent a short email to Bjorkman and another HR representative stating, "Hi, received a full release effective today, 12/16/13." (*Id.* at 920:18-921:3; Ex. 21, Doc. 103-1 at 36). Bjorkman's understanding at that point was that Alwood was capable of returning to work without any restrictions of any kind. (Trial Tr. at 921:10-16).

93.     From that point forward, the dialogue between Alwood and Ecolab focused on whether there was another opportunity for which Alwood was both qualified and interested at Ecolab. (*Id.* at 315:22-316:1).

94.     On January 2, 2014, Bjorkman advised Alwood over the phone that she would work with him to identify positions in which he expressed interest and for which he was qualified. (*Id.* at 317:15-318:6). Bjorkman also discussed with Alwood the fact that he would be eligible for a severance package if he was unable to identify a position in which he was interested and for which he was qualified. (*Id.* at 925:17-25).

95.     The same day, Bjorkman sent Alwood a letter indicating that Ecolab did not have a current opening in the Billings District and directed him to Ecolab's website for open positions within the company. (Ex. 104, Doc. 103-2 at 13). She told Alwood that he could begin exploring opportunities on Ecolab's job website. (*Id.* at 926:23-927:1). She also advised him that if he identified any positions that

26

required him to relocate, he would need to do so at his own expense. (Ex. 104, Doc. 103-2 at 13).

96. On January 3, 2014, Alwood expressed concern about his ability to apply for positions with Ecolab through the Company's on-line job-posting site, EcoJobs, "because [he] did not know who [his] manager [was] to answer the questions." (Trial Tr. 318:19-25; Ex. 103, Doc. 103-2 at 12). Bjorkman promptly responded to Alwood's concerns informing him that he should list Salstrand as his manager. (*Id.* at 319:13-15, 930:9-20). Alwood, however, balked at doing so, because "since I wasn't a District Manager, I wasn't a direct report of Scott Salstrand, so he was not my manager. So, I couldn't truthfully answer the question on my application." (*Id.* at 319:16-21, 319:22-320:4; Ex. 103, Doc. 103-2 at 12).

97. In another email to Alwood, Bjorkman encouraged him to review the job opportunities identified on Ecolab's website and urged him to contact her if he wanted to discuss specific opportunities. (*Id.* at 321:1-6; Ex. 104, Doc. 103-2 at 13). In the same email communication, Bjorkman reminded Alwood that if he was not able to identify a position in which he was interested and for which he was qualified, he would be eligible to participate in Ecolab's severance plan. (*Id.* at 321:7-12).

98. On January 6, 2014, Alwood applied for the Safety, Health and Environmental Specialist position and received an automatic reply that his

27

application was being reviewed. (Bjorkman Depo. p. 128:5-9; 167:3-8, Doc. 31-13; Ex. 107, Doc. 103-2 at 19).

99.     On January 7, 2014, Alwood sent Bjorkman an email inquiring about open DM positions, open AM positions and open Corporate Account positions. (Trial Tr. 322:3-7; Ex. 105, Doc. 103-2 at 14).

100.     Bjorkman responded to Alwood, pointing out that he was not eligible for either the AM or Corporate Account positions, inasmuch as those were both positions more senior to and higher in the Ecolab job hierarchy than any position Alwood had occupied during his Ecolab career. (Trial Tr. 323:21 – 324:2; Ex. 105, Doc. 103-2 at 14-15).  At the same time, Bjorkman stated that she would identify open DM positions for Alwood.  (*Id.* at 324:4-6).

101.     Shortly thereafter, after seeking assistance from Bruce Weiss, the HR Director for the Institutional Division, Bjorkman provided Alwood information regarding open DM positions.  (*Id.* at 324:7-25; Ex. 106, Doc. 103-2 at 16) Bjorkman identified eight open DM positions in various parts of the U.S. for which Alwood was qualified.  (*Id.* at 325:1-10).  Alwood previously had advised Bjorkman that he was willing to consider DM positions in any geography.  (Ex. 106, Doc. 103-2 at 16).  But, when presented with eight alternative DM options, Alwood was not interested in any of them.  (Trial Tr. at 325:11-17).  Consequently,

Alwood did not apply for any of the eight DM positions Bjorkman had identified. (*Id.* at 326:12-14; 939:4-8).

102.   Bjorkman followed up with Alwood via email to explore whether he was interested in any of the positions, but Alwood did not respond to her inquiry. (*Id.* at 938:16-25).

103.   Alwood applied for one position with Ecolab in January 2014 - a Safety, Health and Environmental Specialist position. (*Id.* at 327:16-20; 940:10-16; Ex. 205, Doc. 103-3 at 30). Alwood believed that he could perform that role while remaining in Billings, even though the position description stated that the position was based in St. Paul, Minnesota. (*Id.* at 327:21-24). Alwood lacked the minimum educational requirements specified in the position description. (*Id.* at 329:2-5; 941:2-9).

104.   From December 16, 2013 through the end of Alwood's employment, he did not speak with Salstrand about any opportunities in the Rocky Mountain Area, and did not speak with Salstrand about resuming his role as the Billings DM. (*Id.* at 329:22-330:9). Moreover, Alwood did not speak with anyone else in the Rocky Mountain Area about potential work opportunities in that geographic area. (*Id.*). Similarly, Alwood did not discuss with Bjorkman the possibility of obtaining a TM position. (*Id.* at 330:15-17).

105. Ecolab unilaterally decided to extend the 30 days available to Alwood for him to secure another position within Ecolab. (Ex. 120, Doc. 103-2 at 20).

106. Bjorkman sent Alwood an email on January 31, 2014, and informed him that if he did not identify other positions in which he was interested and for which he was qualified by February 6, 2014, his employment with Ecolab would end and he would become eligible for Ecolab's severance plan. (*Id.* at 333:1-21; 942:8 -943:13). Alwood did not respond to Bjorkman's e-mail, nor did he apply for any additional positions. (*Id.* at 333:22-24; 943:14-17).

## X. Alwood's Termination from Ecolab

107. On February 10, 2014, Bjorkman wrote to Alwood and advised him that he was being separated from Ecolab and that his separation date would be retroactive to February 6, 2014. (*Id.* at 334:22-25; Ex. 120, Doc. 103-2 at 44). Bjorkman's February 10 correspondence to Alwood marked the end of Alwood's employment with Ecolab. (*Id.* at 335:1-3).

108. Salstrand testified that, if he had known that Alwood would have been able to return to work in November or December of 2013, he would not have replaced him. (*Id.* at 751:9-12).

109. Bruce Weiss, Ecolab's corporate representative, testified that the decision to replace Alwood was made to protect Ecolab's bottom line. (*Id.* at 500:21-23).

## XI.  Alwood's Post-Ecolab Employment

110.  Alwood's Ecolab employment ended in February 2014. (*Id.* at 344:7-8).  In February 2015, Alwood obtained a position as an Inside Salesman with a Billings company called Industrial Sales and Service ("Industrial"). (*Id.* at 344:10-16).  In this capacity, Alwood was involved in selling industrial products. (*Id.* at 344:17-18).

111.  Alwood's starting compensation with Industrial was $42,000 per year. (*Id.* at 19-20).  Alwood was a salaried employee so he was not eligible for overtime compensation. (*Id.* at 344:21-23, 345:2-3).  Alwood could have obtained insurance benefits through Industrial, but declined those benefits because he was covered under his wife's insurance plan through the Billings School District. (*Id.* at 345:7-14).

112.  Since commencing employment with Industrial, Alwood continued to explore alternative job opportunities. (*Id.* at 345:19-22).  Alwood testified that he intends to continue looking at other employment opportunities. (*Id.* at 345:24-25).  Alwood stated further that if a better opportunity comes along, he may pursue it. (*Id.* at 346:4-6).

## XII.  Alwood's Current Mental Health Status

113.  When Alwood was deposed in August 2015, he testified that his physical health was fine. (*Id.* at 341:4-7).  He noted that he was not experiencing

any "particular problems of any kind." (*Id.* at 341:8-10). At that time, he was not under the care of a physician. (*Id.* at 341:12-15). He was not using any prescription, or even non-prescription, medications. (*Id.* at 342:4-14).

114. Alwood further testified that he was not seeing any medical doctor for help with any mental health issues. (*Id.* at 342:15-18). Alwood testified that the last person he had seen for any mental health assistance of any kind was his former therapist, Kietzman, and he last saw her in February 2014. (*Id.* at 343:7-11, 343: 23-25, 344:1-3).

115. The period in which he experienced his most severe depression and anxiety was the time frame leading up to mid-August, 2013, when he went out on leave. (*Id.* at 249:12-16).

116. As Alwood described it, in the period while he was on leave (August through mid-December), his mental health improved. (*Id.* at 250:10-251:6). The prescription medications made him calmer, helped him "balance out [his] focus," and helped him "focus better." (*Id.* at 251:7-13).

117. Alwood's self-assessment with respect to his mental health, was corroborated by his psychologist, Kietzman. As described above, by December 16, 2013, Kietzman had concluded that Alwood "has recovered substantially from his medical condition." (*Id.* at 103:11-17; Ex. 102, Doc. 103-2 at 11). She determined that as of mid-December, he was "ready and able to resume his full work

schedule." (*Id.*). Moreover, by early January, Kietzman and Alwood discussed whether Alwood should continue his disability leave. Kietzman concluded that additional leave would *not* be appropriate and that Alwood was "capable of going back to work." (*Id.* at 97:16-98:3).

## CONCLUSIONS OF LAW

### I. Alwood Failed to Prove Disability Discrimination.

1. Under the Montana Human Rights Act, it is unlawful for an employer to discriminate against an employee on the basis of a physical or mental disability, unless the reasonable demands of the position require a distinction based on physical or mental disability. Mont. Code. Ann. § 49-2-303(1)(a).

2. "Physical or mental disability" includes "a physical or mental impairment that substantially limits one or more of a person's major life activities." *McDonald v. Dep't of Envtl. Quality*, 214 P.3d 749, 758 (Mont. 2009) (quoting Section 49-2-101(19)(a)(i), MCA; *accord* 29 C.F.R. § 1630.2(g)(1)). Work is considered a major life activity. *Id.*

3. A person with a physical or mental disability is qualified to hold an employment position "if the person can perform the essential functions of the job with or without a reasonable accommodation for the person's physical or mental disability." *Id.* at 758-59 (quoting Admin. R.M. 24.9.606(2); *see also* 29 C.F.R. app. § 1630.9).

33

4. There is no dispute that Alwood's depression was a mental impairment which substantially limited his ability to work and that he was otherwise qualified to hold his position with Ecolab.

5. Discrimination can be proved by either direct or circumstantial evidence. Circumstantial evidence cases are ones in which the parties dispute the reason for the employer's action. *Reeves v. Dairy Queen, Inc.*, 953 P.3d 703 (Mont. 1998). Here, the parties dispute the reason for Ecolab's action: Alwood asserts Ecolab terminated him because of his disability; Ecolab asserts it terminated Alwood when he failed to find another job at Ecolab within the prescribed time frame.

6. Claims of employment discrimination involving circumstantial evidence are analyzed under the *McDonnell Douglas* test. *See Ray v. Montana Tech of Univ. of Montana*, P.3d 122, 129 (Mont. 2007). Ultimately, under the *McDonnell Douglas* test, the plaintiff first has the burden of proving, by the preponderance of the evidence, a prima facie case of discrimination. *Id.*

7. Discrimination based on physical or mental disability includes "the failure to make reasonable accommodations that are required by an otherwise qualified person who has a physical or mental disability." MCA § 49-2-101(19)(b).

8. Alwood asserts that Ecolab engaged in disability discrimination in the following two ways. First, Alwood claims that Ecolab, as part of its obligation to

34

provide a reasonable accommodation, was required to keep the Billings DM position vacant during his indefinite leave until such time as Alwood and his therapist determined he was well enough to return to work. Second, Alwood claims that Ecolab was obligated as part of an "interactive process" to find him a new position within Ecolab after he received a full release to work without restrictions.

9.      For the reasons that follow, the Court finds that Ecolab fulfilled Alwood's requested accommodation. Further, keeping the Billings DM position vacant indefinitely did not amount to a reasonable accommodation. The Court also concludes that after Alwood received a full release to work without restrictions, he no longer was disabled and therefore no longer entitled to the "interactive process" or a reasonable accommodation. To the extent Alwood was entitled to an "interactive process" after he received clearance to work, however, Ecolab met its obligations under Montana law.

### A.      Ecolab provided Alwood with his requested accommodation.

10.      To receive an accommodation, an employee generally has to request it. *See, e.g., Reeves,* 953 P.2d at 711; *see also Brown v. Lucky Stores, Inc.,* 246 F.3d 1182, 1188-89 (9th Cir. 2001) (holding that the employer had no duty to

provide accommodation to its employee, "given that she never requested one.").[1]

Alwood's requested accommodation was a leave of absence. Ecolab granted this

request by placing him on the Company's Short-Term Disability Plan. (Agreed

Facts ¶ 9, Doc. 81).

11. Alwood asserts that Ecolab was also required to keep the Billings DM

position vacant while he remained out as a reasonable accommodation. The Court

disagrees. Ecolab's Short-Term Disability Policy advised Alwood that:

Ecolab will make reasonable efforts to reinstate employees returning
from medical leaves into positions of equal status and pay, but *re-
employment is not guaranteed. Re-employment is dependent on the
length of the leave, whether the date of return is definite or
indefinite, successful recovery or rehabilitation from the disability
and availability of a position.* An individualized analysis will be
reviewed for each situation.

(Ecolab HR Policy Manual, Ex. 200, Doc. 103-3 at 22) (emphasis added). At the

time he went out on leave, Alwood had the policy and acknowledged that the

policy applied to him. (Trial Tr. 241:2-5, 337:16-338:23; *see also* Ex. 316). The

policy advised Alwood that his position might be filled the longer he remained on

indefinite leave. Despite this, Alwood did not request as an accommodation that

Ecolab keep the Billings DM position vacant, nor did he request that Ecolab

---

[1] Because the MHRA is modeled on federal anti-discrimination laws, such as the ADA, it is
useful and appropriate to consider federal statutes, regulations, and case law as persuasive
authority when interpreting provisions of the MHRA. *McDonald*, 214 P.3d 749, 758.

36

reinstate him as the Billings DM following his return. (*Id.* at 316:3-8). The fact that Alwood did not request these accommodations are fatal to his claims. *See Brown,* 246 F.3d at 1188-89; *see also Zivkovic v. S. California Edison Co.,* 302 F.3d 1080, 1089 (9th Cir. 2002).

### B. Keeping the Billings District Manager position vacant indefinitely did not amount to a reasonable accommodation.

12.     "An accommodation to a person with a physical or mental disability for the purpose of enabling the person to perform the essential functions of an employment position is reasonable unless it would impose an undue hardship upon the employer." Mont. Admin. R. 24.9.606(4). An "undue hardship" is one that "impose[s] significant difficulty or extraordinary costs" upon the employer. Mont. Admin. R. 24.9.606(5).

13.     For purposes of determining whether an accommodation to a physical or mental disability is reasonable, "undue hardship" means an action requiring significant difficulty or extraordinary cost when considered in light of:

(a) the nature and expense of the accommodation needed;

(b) the overall financial resources of the facility or facilities involved in the provision of the accommodation, the number of persons employed at the facility, the effect on expenses and resources of the facility, and other impacts of the accommodation on the operation of the facility;

(c) the overall financial resources of the business, the overall size of the business of the employer with respect to the number of employees, and the number and type and location of the facilities of the employer; and

37

(d) the type of operation or operations of the employer, including composition, structure, and functions of the work force of the employer, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the employer. *McDonald,* 214 P.3d at 749.

14.     Because keeping the Billings DM position vacant until Alwood returned from his indefinite leave would have imposed an undue hardship upon Ecolab, Ecolab was not required to do so as part of an accommodation.

**(1)     Indefinite leaves of absence are not considered a reasonable accommodation.**

15.     Employers under the Montana Human Rights Act (MHRA) are "not required to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence." *See Pannoni v. Bd. of Trustees*, 90 P.3d 438 (Mont. 2004); *see also Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 338 (2d. Cir. 2000) ("The duty to make reasonable accommodations does not, of course, require an employer to hold an injured employee's position open indefinitely while the employee attempts to recover…."). Significantly, the EEOC, in its most recent policy guidance, stated that an "indefinite leave - meaning that an employee cannot say whether or when she will be able to return to work at all - will constitute an undue hardship, and so does not have to be provided as a reasonable accommodation." U.S. Equal Employment Opportunity Commission, Employer-Provided Leave and the Americans with Disabilities Act, *available at* www.eeoc.gov/eeoc/publications /ada-leave.cfm.

16. In this case, at the time Ecolab hired a new Billings DM, Alwood was by definition on an *indefinite* leave of absence. Alwood and his therapist, Kietzman, both testified that at the time Alwood began his leave of absence, they did not know how long Alwood would be out of work. (Trial Tr. 229:2-22). No one at Ecolab knew when (or whether) Alwood would return. (*Id.* at 624:2-2, Ex. 4, Doc. 103-1 at 1) ("At this time, we have not received any documentation supporting anticipated length of time removed from work); (Trial Tr. at 631:4-9) (Salstrand testifying that at no time did he ever learn when Alwood might be returning); (*id.* at 637:15-22; *id.* at 802:14-803:6; *id.* at 810:18-811:6).

17. At no point prior to Ecolab naming a new Billings DM did Alwood communicate to Ecolab how long he anticipated being out or whether he would return to work. Neither Kietzman's initial letter to Ecolab nor the September 6, 2013 SOD provided any information regarding when (or whether) Alwood might return, the length of his treatment plan, or his prognosis. (Exs. 100, 125, Doc. 103-2 at 9, 48). On the contrary, the September 6, 2013 SOD stated that Alwood was "totally disabled," and that his return to work was "unknown" and "depend[ed] on his response to future treatment." (Ex. 125, Doc. 103-2 at 48). Alwood acknowledged at trial that the September 6, 2013 SOD accurately characterized his condition and status at the time. (Trial Tr. 254:1-3). Even as late as November 1, 2013, Alwood told Ecolab's Disability Case Manager, Burgess, that he still did not

39

know how long he would remain away from work. Trial Tr. 291:12-292:18. Given this ongoing uncertainty regarding when (or whether) Alwood would be able to return to work, Ecolab concluded it had no choice but to name a new Billings DM.

18. Because Ecolab did not know when, or whether, Alwood would be able to return, Ecolab was not required to keep the Billings DM position vacant indefinitely as part of a reasonable accommodation. *See Pannoni*, 90 P.3d 438; *Parker*, 204 F.3d at 338; *Myers v. Hose*, 50 F.3d 278, 283 (4th Cir. 1995) ("[F]or the [employer] to be forced to stand by – or hire temporary help – while [the employee] endeavors to improve his failing health would be a significant burden."). To do so would have imposed a substantial hardship upon Ecolab.

19. Alwood asserts that Ecolab should have asked his therapist, Kietzman, about the duration of his leave. But as Kietzman herself testified, it would "have been uncommon" for her to have direct communications with a patient's employer. (Trial Tr. at 80:24-81:3). Moreover, Alwood's argument ignores the fact that the way Ecolab communicates with medical providers is through the SODs. The single SOD Ecolab received from Kietzman prior to naming a replacement DM noted that Alwood was "totally disabled" and that his return to work was "unknown." (Ex. 125, Doc. 103-2 at 48). Because Ecolab had requested that Alwood and Kietzman provide regular updates on Alwood's return-to-work status,

the fact no one at Ecolab received any information after the September 6, 2013

SOD, led Ecolab conclude that the duration of Alwood's leave remained

"unknown." (Trial Tr. 236:6-15). This was consistent with what Alwood told

Burgess when she asked him in early-November if he knew whether or when he

may be returning and he said he didn't know. (*Id.* at 291:12-292:18).

    20.    Alwood argues that the SOD dated November 12, 2013 demonstrates

that his leave was not really indefinite. (*See* Ex. 204, Doc. 103-3 at 29). But

Ecolab has no record of receiving this document. And although Alwood asserted

at trial that he submitted this document, his testimony in this regard directly

contradicted the testimony provided during his deposition. At his deposition,

Alwood unequivocally testified that neither he nor his therapist ever communicated

with anyone at Ecolab about coming back with an accommodation. (Trial Tr.

307:7-309:4). But the November 12 SOD states that Alwood could potentially

return by December 16, 2013 on a part-time basis *with accommodations*. (Trial Tr.

304:21-305:5; Ex. 204, Doc. 103-3 at 29). Because Alwood's testimony at trial

directly conflicts with the deposition testimony in which he stated he never

communicated with Ecolab about an accommodation, the Court gives no weight to

his claim that he actually provided the November 12 SOD.

    21.    There are other indicia that Alwood never provided the November 12

SOD to Ecolab. For one, Burgess sent Alwood information on Ecolab's Long-

Term Disability Plan on November 14, 2013, something that would have been entirely unnecessary had Alwood notified Ecolab of a potential December 16, 2013 return-to-work date. (Ex. 117, Doc. 103-2 at 40-41). Moreover, the November 12 SOD referenced part-time work, but Alwood conceded he could not perform as a DM on a part-time basis. (Trial Tr. 103:21-104:7; Ex. 204, Doc. 103-3 at 29).

22. Even assuming Alwood did submit the November 12 SOD, it would have been received after Ecolab already named a new Billings DM. Immediately prior to being replaced, Alwood informed Burgess that he still did not know when he could return. (Trial Tr. 291:12-292:18). Similarly, both of the documents he previously provided to Ecolab regarding his return-to-work status (the initial letter from Kietzman and the September 6 SOD) failed to contain a return date or explicitly stated that his return was "unknown." It is undisputed that in November 2013, when Ecolab finally decided it had to put a new DM in the Billings District, it did not know when or whether Alwood ever would be healthy enough to return. The November 12 SOD does nothing to change that fact.

### (2) Alwood's indefinite leave imposed an undue burden on the Billings District.

23. Alwood's indefinite absence was detrimental to Ecolab's relationships with its customers and employees in the Billings District.

24. The condition of the Billings District shortly before Alwood's leave significantly hindered Ecolab's ability to absorb the prolonged absence of the

42

District's most important, most senior manager. The Billings District was already understaffed, morale was low, and at least one TM was threatening to quit. (Trial Tr. 604:15-610:13; Ex. 111, Doc. 103-2 at 23). Alwood himself described the District as being "strained to the max." (Ex. 13, Doc. 103-1 at 20). In the month before Alwood began his leave, the Billings District had lost a $60,000 per year customer. (Trial Tr. 271:24-272:7). The indefinite leave of the Billings DM would not have helped the customer problems that Alwood himself recognized were occurring in the Billings District.

25. The Court also considers the nature of the Billings DM position when determining whether Ecolab had an obligation to keep it vacant indefinitely. *See, e.g., Watkins v. J & S Oil Co.*, 164 F.3d 55, 61 (1st Cir. 1998) (holding that employer is not required to hold managerial position open for an indefinite period of time). The Billings DM is the most senior, most important job in the Billings District. (Trial Tr. 189:23-25; 554:18-555:1). As Alwood described it, the Billings DM is the "boss of the District." (*Id.* at 190:9-10). As a result, keeping the position vacant indefinitely proved to be extremely problematic for Ecolab. (*See, e.g., id.* at 632:15-22; *see also* 798:11-25).

26. In considering whether an accommodation amounts to an undue burden, courts consider among other facts, its financial costs. *See* Mont. Admin. R. 24.9.606(5)(a) (undue hardship imposes "significant difficulty or extraordinary

43

costs" upon the employer). Here, the absence of a Billings DM was having, and would continue to have, a severe detrimental impact on Ecolab's sales in the Billings District. (Trial Tr. 633:13-17; 634:8-16; 638:4-19). There was unrebutted testimony presented at trial that, in Alwood's absence, Ecolab was failing to adequately service many of its customers in the Billings District, including its two largest customers, Town Pump and Sysco Foods. (*Id.* at 634:8-16; 638:4-15; Ex. 7, Doc. 103-1). Real business was lost. Lack of support resulted in Town Pump shifting its hand soap business from Ecolab to another company. (*Id.* at 633:18-634:1). This alone cost the Billings District $100,000 in revenue. (*Id.*). Town Pump decided not to use Ecolab as a service provider at its newest hotel in Bozeman, and instead gave that business to an Ecolab competitor. (*Id.* at 633:18-634:1). In his own letter to Baker written while he was on leave, Alwood noted that Ecolab was "losing major accounts in Montana." (*Id.* at 260:12-14; Ex. 116, Doc. 103-2).

27.    Ecolab also had reason to fear that the Billings District would continue losing significant business the longer it went without a DM. Both Town Pump and Sysco Foods (the latter accounting for more than 50 percent of Ecolab's sales in the Billings District) complained about their relationships with Ecolab. (*Id.* at 633:13-17; 634:8-16; 638:4-19; 757:15-758:15; 773:6-19; 659:17-660:3). Salstrand thought the loss of Town Pump's business was imminent. (*Id.* at 638:4-

15; 757:15-758-15). Losing either Sysco Foods or Town Pump would have been devastating not only to the Billings District, but also to the Rocky Mountain Area. (*Id.* at 659:17-660:3; 638:16-25; 662:19-663:6). Without an active DM - the person charged with ensuring customer service and satisfaction - Ecolab could not adequately address or resolve its customers' complaints. Trial Tr. 632:15-634:16. Salstrand feared that without a DM's direction, customers would continue moving business away from Ecolab. (*Id.* at 634:8-16; 638:4-639:15).

28. Also, in contrast to the data Alwood presented, other financial reports offered into evidence showed that the Billings District was losing sales during Alwood's absence. (Ex. 225, Doc. 103-3 at 30). During the last three months in which Alwood was active as the Billings DM, the Billings District hit 101.6 percent of its sales goals. (*Id.*). In contrast, during the first three full months after Alwood took leave, the Billings District only reached 94.5 percent of its sale goals - its worst performance over any three-month span in 2013. (*Id.*).

### (3) A temporary replacement would have placed an undue burden on Ecolab.

29. Alwood does not deny the difficulty or importance of the Billings DM position. Instead, he argues that Ecolab could have used temporary help to fulfill the DM's responsibilities while he remained on indefinite leave. (*See, e.g.,* Trial Tr. 707:11-21; 707:25-708:4). But Ecolab presented substantial evidence that, in light of the importance of the DM position, and in light of the fact Ecolab did not

know when or whether Alwood would be returning, using a temporary replacement was not a reasonable solution to the problems facing the Billings District.

30.    Ecolab reasonably believed that bringing in a temporary replacement for Alwood would have only exacerbated the morale and customer problems facing the Billings District. (*Id.* at 761:9-19; 762:17-763:1). As Salstrand described it, the Billings District could not afford a short-term solution, it needed leadership to re-engage those TMs who had become so disillusioned that they were considering resigning. (*Id.*) Ecolab also needed to show its customers, including Sysco Foods and Town Pump, that it had a sustainable plan to address their numerous business concerns in the long-term. (*Id.* at 761:9-19). A temporary replacement would not have accomplished either of these goals.

### (a)    A temporary replacement would have detrimentally impacted other workers.

31.    An accommodation may also be unreasonable when it detrimentally impacts other employees. *See U.S. Airways, Inc. v. Barnett*, 525 U.S. 391, 400 (2002) ("[A] demand for an effective accommodation could prove unreasonable because of its impact, not on business operations, but on fellow employees...."). At trial, there was persuasive testimony that one of the primary reasons Ecolab replaced Alwood was because of the substantial negative impact the absence of a DM was having on other employees in the Billings District. (Trial Tr. 632:15-633:12; 639:16-640:12; 642:12-18; Ex. 7, Doc. 103-1 at 14).

46

32.     When Alwood went out on indefinite leave, there was nobody to provide the leadership, training, or support the TMs needed to effectively do their jobs. *(Id.* at 632:15-633:12; 635:12-23 (noting that with Alwood gone, the only person who could provide "ride-along[s], guidance, assistance, [and] training" was Salstrand); 639:16-640:12; 642:12-18; Ex. 7, Doc. 103-1 at 14). This eventually damaged morale to such an extent that two of the TMs (out of the ten) threatened to resign. *(Id.* at 639:16-640:12; 632:15-22 ("[A] team without a leader is not a good situation. There were multiple territory managers that were struggling; they confided in me that they were contemplating leaving the company."); Ex. 7, Doc. 103-1 at 14). Losing 20 percent of the TMs would have been a substantial hardship to Ecolab, especially considering Alwood's perception of how difficult it is for Ecolab to hire TMs in the Billings District. *(Id.* at 589:21-590:9; Ex. 13, Doc. 103-1 at 19-20).

33.     There were few, if any, individuals qualified or available to fulfill the DM position while Alwood remained on indefinite leave. Though some of Alwood's responsibilities were covered by TMs, TMs generally do not have the skills or experience to provide the requisite leadership and training, or to deal with the troubleshooting and other customer service issues that face a DM. *(Id.* at 651:16-652:2; 762:17-763:1; 770:25-771:8, 805:20-806:3). Bringing a DM from another district also was not a solution, because that would have left another

district without a leader for an indefinite period of time. (*Id.* at 652:3-12; 806:5-13).

34. Even if TMs had the knowledge and experience to cover for Alwood, it still would not have been reasonable to require them to do so. Indeed, accommodations that require employees to work harder are not reasonable. *See Mason v. Avaya Comms., Inc.,* 357 F.2d 1114, 115 n.3 (10th Cir. 2004); *Turco v. Hoechst Celanese Corp.,* 101 F.3d 1090, 1094 (5th Cir. 1996) ("[A]n accommodation that would result in other employees having to work harder or longer is not required under the ADA"); *Milton v. Scrivner, Inc.,* 53 F.3d 1118, 1125 (10th Cir. 1995) (same).

35. Because Ecolab already had a shortage of TMs in the Billings District, it also could not afford to assign a TM to temporarily fill the Billings DM position on a full-time basis. (*See* Trial Tr. 589:21-590:9). As Alwood explained to Baker, the departure of a TM in 2012 left the Billings District "with another vacancy in an extremely large territory with no one to run except me"; in a "rural market" where it is "very difficult to fill positions and even find applicants sometimes because of the demands of the hours and lack of coverage on weekends and vacations" and in an "extremely tough market to hire in." (Ex. 13, Doc. 103-1 at 20, 23-24).

36. Each TM in the Billings District already serviced between 50 and 100 of their own customers, and their jobs required them to be on call 24 hours per day,

48

365 days per year. (Trial Tr. 756:5-757:6; *see also* 267:1-8). Alwood himself explained that "most have no idea how complicated and what a TM experiences during their [*sic*] workday." (Ex. 116, Doc. 103-2 at 34). Similarly, the DM position is also very "intense," "stressful," and "difficult." (Trial Tr. 195:16-22). Like the TM position, the DM role is a 24/7, 365-day-a-year job that requires one to be on the road anywhere from four to seven days per week. (*Id.* at 267:1-11; *see also* 554:18-555:1; 224:25-225:14; 225:21-226:4). Because the demands placed on both TMs and DMs are substantial, it would have been unreasonable to require a TM to take on both roles simultaneously, especially with serious morale problems already prevalent in the District. Alwood put it best in his letter to Baker when he said that Ecolab "cannot expect people to work 12-14-16 hours a day, seven days a week on a regular basis." (Ex. 116, Doc. 103-2 at 34).

37. At trial, Alwood suggested that Salstrand could have covered for him. But Salstrand lived and worked in Denver, CO and was responsible for eight other districts, eight other DMs, and over 100 TMs. (Trial Tr. 762:1-16). It was not feasible for him to continue filling the responsibilities of the Billings DM for the unknown period of time that Alwood remained away. (*Id.*).

38. The size of the Billings District also made it difficult to cover for Alwood indefinitely. (*Id.* at 267:9-13; 588:20-589:20; 799:1-19; Ex. 13, Doc. 103-1 at 20). Because the District is so spread out, the employees in the District are

49

also spread out. (*Id.*). As a result, an employee who has to cover for another must generally travel hundreds of additional miles each week. (*Id.*). As Alwood himself described it in his letter to Baker, covering for someone in the Billings District was "not just as simple as having the neighboring TM take some accounts. We have [a] vast geography and many hours behind the wheel, driving many miles to handle business." (Ex. 13, Doc. 103-1 at 20). Of course, Alwood was referring to coverage for an absent TM. Coverage for a DM, in contrast, would have been even more difficult, due to the fact that a DM is more senior, has substantially more responsibilities than does a TM, and has to ensure the entire District is functioning effectively.

39. In support of his argument that he could be temporarily replaced, Alwood argues that Brian Last, a DM working out of Denver, covered for Alwood with little difficulty. This argument is unpersuasive. Last's sole coverage responsibility was to accept escalated phone calls while Alwood was out. (Trial Tr. 634:17-635:4; 816:19-21). Last did not conduct ride-alongs, training sessions, meet with customers in the Billings District, or fulfill any of the other numerous responsibilities required of a DM. (*Id.* at 635:7-11). Last did not travel to the Billings District during Alwood's absence. (*Id.*). Last effectively covered calls for Alwood, he did not act as a temporary replacement.

## (b) A temporary employee would have potentially devastated Ecolab's Billings Division

40. Alwood also argued that because Ecolab is a large company that had a strong financial performance Company-wide while he was on leave, this demonstrates that his indefinite absence did not pose an undue hardship. While courts may consider a company's overall financial resources in determining the reasonableness of an accommodation, that is but one of many factors. Another factor the Court must consider is the "overall financial resources of the facility or facilities involved in the provision of the accommodation, the number of persons employed at the facility, the effect on expenses and resources of the facility, and other impacts of the accommodation on the operation of the facility." Mont. Admin R. 24.9.606(5)(b). In this case, the "facility" involved in the accommodation was the Billings District. And as discussed above, keeping the DM position vacant imposed substantial hardships on the Billings District in terms of lost sales, lost customers, and lost TMs.

41. In short, because (1) Alwood's absence would have continued to adversely impact Ecolab's relationship with its customers, thereby affecting its sales; and (2) because it negatively impacted other employees, both in terms of the support they were receiving, their ability to service customers, and their morale, the Court concludes that continuing to keep the Billings DM position vacant amounted to an undue hardship.

**C.** **Ecolab was not obligated to engage in the interactive process with Alwood after he received a full-release to work.**

42. Alwood next claims that Ecolab violated Montana's disability discrimination statute by failing to engage with him in the interactive process after he received full clearance to work. This argument fails for two reasons. First, after Alwood was cleared to work without restrictions, Ecolab had no obligation to engage in the interactive process. Second, to the extent Ecolab was obligated to engage in the interactive process with Alwood following his return to work, Ecolab met that obligation.

43. An employee is entitled to an "interactive process" only when he or she suffers from a "disability," as defined under Montana law. *McDonald*, 214 P.3d 749, 767; *Broussard v. Univ. of Cal.*, 192 F.3d 1252, 1259 (9th Cir. 1999) (the failure to engage in the interactive process was "negated by the fact that [the plaintiff was] not disabled."). Here, Alwood and his therapist acknowledged that, as of December 16, 2013 - the date he was cleared to work - he did not suffer from a disability requiring an accommodation. (Trial Tr. 97:19-25). To the contrary, his December 16, 2013 release stated that he was cleared to work "without restrictions." (Ex. 102, Doc. 103-2 at 11). Because there is no evidence that Alwood continued to suffer from a disability after December 16, 2013, Ecolab had

no legal obligation to engage with him in the interactive process. *See Broussard*, 192 F.3d at 1259.

44. To the extent Ecolab did have an obligation to engage in an "interactive process" with Alwood following his clearance to work, Ecolab met its obligations. Though Ecolab generally gives employees who are replaced while on leave 30 days to find a new position, Ecolab gave Alwood 56 days. (Trial Tr. 943:14-17; 946:2-24; Exs. 110, 120, Docs. 103-2 at 22, 44). During those 56 days, the only position Alwood applied for was a Safety, Health, and Environment position located in St. Paul, MN. (Agreed Facts ¶¶ 11-12, Doc. 81). Because Alwood did not meet the minimum educational requirements for the position, a different candidate was chosen. (Trial Tr. 986:25-989:1). Alwood asserts that Ecolab has made exceptions to minimum requirements with respect to other positions. Yet, as Bruce Weiss testified, Ecolab would not, and could not, make an exception for the Safety, Health, and Environment Specialist, since that position had direct responsibility for customer and company safety. (*Id.* at 988:1-10). Moreover, as discussed below, the Safety, Health, and Environment Specialist position required relocation to St. Paul, and Alwood acknowledged that he was unwilling to leave the Billings area. (*Id.* at 988:16-19).

45. During the 56 days following Alwood's return from leave, Ecolab provided him with a list of DM positions that the Company anticipated would

become available in the near future. (Ex. 24, Doc. 103-1 at 39). Alwood, however, was not interested in any of those positions, as they all were located outside of the Billings District. (*Id.* at 937:11-939:8). Alwood, nonetheless, suggests that Ecolab was required to find him a comparable position in the Billings District. But no such positions were open in the Billings District following Alwood's clearance to work. (*Id.* at 498:11-15; 499:16-18). As a result, for Alwood to re-join the Billings District, Ecolab would have had to either create a new position just for him or else remove another employee from his or her position. Even assuming Ecolab had a duty to accommodate Alwood after he received a full work release, that duty did not require the Company to create a new position or remove others from their positions. *See Wellington v. Lyon County School Dist.*, 187 F.3d 1150, 1155 (9th Cir. 1999) (school district did not have a duty to create a new position to accommodate disabled employee); *Sevcik v. Unlimited Const. Servs., Inc.*, 462 F. Supp. 2d 1140, 1148 (D. Hawaii 2006) (employer is not obligated to create a new position to accommodate disabled employee or remove an existing employee from the position that the disabled employee now desires); *Staub v. Boeing Co.*, 919 F. Supp. 366, 371 (W.D. Wash. 1996) (same).

46.     Alwood also asserts that Ecolab could have promoted him to the position of Area Manager. But, as a matter of law, Ecolab is not obligated to

promote him as a part of an accommodation. *See, e.g., Hedrick v. Western Reserve Care Sys.*, 355 F.3d 44, 457 (Fed. Cir. 2004) ("The ADA does not require an employer to offer an employee a promotion as a reasonable accommodation.") *Malabara v. Chi. Tribune Co.*, 149 F.3d 690, 699 (7th Cir. 1998); *Cassidy v. Detroit Edison*, 138 F.3d 629, 634 (6th Cir. 1998); *Shiring v. Runyon*, 90 F.3d 827, 832 (3d Cir. 1996); *Gomez. v. American Bldg. Maintenance*, 940 F. Supp. 255, 260 (N.D. Cal. 1996); *Staub*, 919 F. Supp. at 37. Further, Alwood's suggestion that he would have performed as an AM also ignores the fact that the AM position would have required him to move from Billings. Both Alwood and his wife made clear that their ties to Billings - his wife's job, their daughter and her husband, their three grandchildren - made the prospect of moving completely unattractive. Trial Tr. 113:1-115:2; 482:2-483:1.

47.     In short, Ecolab was not obligated to reasonably accommodate Alwood once he no longer suffered from a disability. Moreover, the evidence presented at trial proved that Ecolab was ready, willing, and able to put Alwood in a position for which he was both interested and qualified. Alwood's failure to express any legitimate interest in finding alternative positions is what broke down the interactive process. *Zivkovic*, 302 F.3d at 1089 (holding that "[l]iability for failure to provide reasonable accommodations ensues only where the employer bears responsibility for the breakdown" in the interactive process"); *Daley v.*

*Cablevision Sys. Corp.*, 2016 WL 880203, at \*6 (S.D.N.Y. March 7, 2016) (holding that an employee's disability discrimination claim based on a failure to accommodate failed because he only had applied for only a single alternative vacant position). As a result, to the extent Ecolab had an obligation to engage in the interactive process with Alwood, it did so.

## II.   Alwood's Retaliation Claims Fail

48.   Alwood also claims that Ecolab retaliated against him for taking a leave of absence. He asserts Ecolab's decision to replace him as the Billings DM in November 2013 amounted to an act of retaliation. He similarly claims that the decision to terminate his employment in February 2014 was retaliatory.

49.   For Alwood to prevail on either of his retaliation theories, he must prove by a preponderance of the evidence that: (1) he engaged in protected activity; (2) he subsequently was subject to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *Rolison v. Bozeman Deaconess Health Servs., Inc.*, 111 P.3d 202, 206 (Mont. 2005). Under the familiar burden-shifting analysis, if Alwood articulates a *prima facie* case, Ecolab must provide a legitimate, non-retaliatory reason for its actions. *Id.* at 496. Once Ecolab does so, Alwood must produce evidence that establishes his *prima facie* case as well as evidence that raises an inference that Ecolab's proffered reason is pretextual. *Id.*

## A. Alwood failed to prove that Ecolab replaced him in retaliation for his taking disability leave.

50.    Ecolab established that it replaced Alwood as the Billings DM because it did not know when or if Alwood would return from leave, and because in the absence of a DM, the Billings District was experiencing significant difficulties. This constitutes a legitimate, non-retaliatory basis for Ecolab's decision.

51.    Because Ecolab articulated legitimate, non-retaliatory reasons for naming a new Billings DM, the burden shifted to Alwood both to "produce evidence that establishes his *prima facie* case," as well as to produce evidence that raises an inference that Ecolab's proffered reason is pretextual. *Rolison*, 111 P.3d at 206. Alwood has done neither.

52.    First, Alwood did not offer any evidence establishing that retaliatory animus arising from his decision to take leave caused his subsequent replacement. As described at length above, the evidence shows that Ecolab replaced Alwood due its uncertainty about when or whether he would return to work, and because in his absence, the significant problems already existing in the Billings District worsened. Because Alwood failed to prove the requisite causation, he did not establish his *prima facie* case of retaliation.

53.    Second, Alwood cannot demonstrate that Ecolab's proffered legitimate reasons for naming a new Billings DM were pretextual. Again, the

57

evidence demonstrated that the Billings District was struggling in 2013. Alwood himself detailed these problems in his letter to Ecolab's CEO. Moreover, the fragile condition of the District was exacerbated as a result of Alwood's indefinite leave. The evidence further establishes that Ecolab legitimately concluded it had to hire a new Billings DM to address these problems. Indeed, beginning in early-September 2013, Salstrand communicated with Ecolab's HR Department about the District's problems, and about how to go about resolving them. (*See* Ex. 7, Doc. 103-1 at 14; *see also* Trial Tr. 803:7-15). Because Alwood has offered no evidence showing that Salstrand was fabricating his concerns about the District, concerns Alwood himself described in various documents, he cannot show pretext.

54. As long as Salstrand replaced Alwood because he believed the Billings District needed a DM, then his decision was not based on retaliatory animus. *Nealey v. Water Dist. No. 1 of Johnson Cty.*, 324 F. App'x 744, 748 (10th Cir. 2009) ("We consider the facts as they appeared to the person making the decision, and we do not second-guess the employer's decision even if it seems in hindsight that the action taken constituted poor business judgment. . . . The court does not 'act as a super personnel department, second guessing employers' honestly held (even if erroneous) business judgments") (citing cases); *Cooper v. United Air Lines, Inc.*, 82 F. Supp. 3d 1084, 1111 (N.D. Cal. 2015) (same);

*Hutchins v. DIRECTV Customer Serv., Inc.*, 963 F. Supp. 2d 1021, 1032 (D. Idaho 2013) (same).

55.   Again, in addition to the testimony Salstrand gave at trial, his real time communications to Ecolab's HR Department illustrates that he was genuinely concerned about the Billings District, its TMs, and its customers. (Ex. 7, Doc. 103-1 at 14).   Marina Pariseau similarly testified that she believed Salstrand was truly worried about the state of the Billings District in the absence of a DM. (Trial Tr. 803:7-15; 806:14-24; 831:1-4).   Alwood provided no evidence to rebut this testimony.   On the contrary, he admitted at trial that he did not actually know whether Ecolab retaliated against him for taking leave.  (*Id.* at 263:12-18). Alwood has failed to establish his retaliation claim by a preponderance of the evidence.

### B.   Alwood failed to prove that Ecolab terminated him in retaliation for his taking disability leave.

56.   Alwood also failed to prove that the decision to terminate his employment resulted from retaliatory animus.   Again, Ecolab offered substantial evidence that it terminated Alwood's employment not because he took disability leave, but because he was unable or unwilling to identify any positions for which he was qualified.  *See* Part I.B, *supra.*  This also is a legitimate, non-retaliatory basis for Ecolab's decision to terminate Alwood's employment.  *See Alston v. Microsoft Corp.*, 851 F. Supp. 2d 725, 732 (S.D.N.Y.) *aff'd* 519 F. App'x 23 (2d

59

Cir. 2013) (holding that plaintiff's refusal to respond to defendant's "repeated and unavailing efforts to arrange for [plaintiff] to return to work" and ultimate failure to return to work constituted a legitimate reason for termination).

57. Alwood did not offer evidence to rebut Ecolab's legitimate reasons for terminating his employment. Indeed, he acknowledged that he applied for only a single position, and he acknowledged he did not meet the requirements of that position. (*See* Part I.C, *supra*). There is also no dispute that Ecolab presented him with multiple other DM opportunities, and that he was not interested in any of them. (*Id.*). Alwood admitted at trial that Ecolab ended his employment because he could not find an alternative position after he returned from leave. (Trial Tr. 262:25-265:5). For these reasons, Alwood's second retaliation theory also fails.

58. Because the Court has determined that Ecolab neither engaged in disability discrimination nor retaliated against Alwood, it need not consider Alwood's claim for damages.

## III. Conclusion

For the reasons stated above, Plaintiff's request for relief on all claims is denied. The Court will enter judgment in favor of Defendant Ecolab, Inc.

## ORDER

The Court having conducted a bench trial on the issues of Robert Alwood's claims of alleged discrimination and retaliation, and upon consideration of the

60

parties' proposed findings of fact and conclusions of law (Docs. 116, 117), and

other relevant filings on the record before the Court, and for the reasons set forth

above, IT IS HEREBY ORDERED that Plaintiff Alwood's claims for relief are

DENIED. The Clerk of Court is DIRECTED to enter judgment for the defendant

Ecolab, Inc., and against the plaintiff, Robert Alwood. The Clerk of Court is also

DIRECTED to terminate all pending motions as moot.

IT IS SO ORDERED.

DATED this 27th day of March, 2017.

SUSAN P. WATTERS
United States District Judge